# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

PLAINTIFFS
ELI VERSCHLEISER

DEFENDANTS
JACOB FRYDMAN, LANNY DAVIS, CRAIG GOULD, FIRST CAPITAL REAL ESTATE INVESTMENTS, LLC, FIRST CAPITAL REAL ESTATE TRUST, INC. ALEXANDER URBIN, MERCER STREET PARTNERS, MONICA

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
40 Wall Street, 60th Floor
New York, New York 10005
212-742-0707

ATTORNEYS (IF KNOWN)

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

VIOLATIONS OF RICO, 18 U.S.C. 1962(C), Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d), 15 U.S.C. § 1125(a), VIOLATION

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No [x]Yes [ ]

Judge Previously Assigned

If yes, was this case Vol. [ ] Invol. [ ] Dismissed. No [ ] Yes [ ] If yes, give date _____ & Case No. _____

Is this an international arbitration case?    No [x]    Yes [ ]

*(PLACE AN [x] IN ONE BOX ONLY)*    NATURE OF SUIT

## TORTS

## ACTIONS UNDER STATUTES

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY | [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | [ ] 422 APPEAL 28 USC 158 | [ ] 375 FALSE CLAIMS |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | | | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 376 QUI TAM |
| [ ] 130 MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | [ ] 365 PERSONAL INJURY PRODUCT LIABILITY | [ ] 690 OTHER | | [ ] 400 STATE REAPPORTIONMENT |
| [ ] 140 NEGOTIABLE INSTRUMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | | | [ ] 410 ANTITRUST |
| [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 340 MARINE | | PROPERTY RIGHTS | | [ ] 430 BANKS & BANKING |
| | [ ] 345 MARINE PRODUCT LIABILITY | PERSONAL PROPERTY | [ ] 820 COPYRIGHTS | [ ] 880 DEFEND TRADE SECRETS ACT | [ ] 450 COMMERCE |
| [ ] 151 MEDICARE ACT | [ ] 350 MOTOR VEHICLE | [ ] 370 OTHER FRAUD | [ ] 830 PATENT | | [ ] 460 DEPORTATION |
| [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | [ ] 371 TRUTH IN LENDING | [ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATION | | [x] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 360 OTHER PERSONAL INJURY | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | [ ] 840 TRADEMARK | | [ ] 480 CONSUMER CREDIT |
| | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | SOCIAL SECURITY | | [ ] 485 TELEPHONE CONSUMER PROTECTION ACT |
| [ ] 160 STOCKHOLDERS SUITS | | | [ ] 861 HIA (1395ff) | | |
| [ ] 190 OTHER CONTRACT | | LABOR | [ ] 862 BLACK LUNG (923) | | [ ] 490 CABLE/SATELLITE TV |
| [ ] 195 CONTRACT PRODUCT LIABILITY | PRISONER PETITIONS | [ ] 710 FAIR LABOR STANDARDS ACT | [ ] 863 DIWC/DIWW (405(g)) | | [ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE |
| | [ ] 463 ALIEN DETAINEE | [ ] 720 LABOR/MGMT RELATIONS | [ ] 864 SSID TITLE XVI | | |
| [ ] 196 FRANCHISE | [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255 | [ ] 740 RAILWAY LABOR ACT | [ ] 865 RSI (405(g)) | | [ ] 890 OTHER STATUTORY ACTIONS |
| | [ ] 530 HABEAS CORPUS | [ ] 751 FAMILY MEDICAL LEAVE ACT (FMLA) | FEDERAL TAX SUITS | | [ ] 891 AGRICULTURAL ACTS |
| | [ ] 535 DEATH PENALTY | | [ ] 870 TAXES (U.S. Plaintiff or Defendant) | | [ ] 893 ENVIRONMENTAL MATTERS |
| REAL PROPERTY | [ ] 540 MANDAMUS & OTHER | [ ] 790 OTHER LABOR LITIGATION | [ ] 871 IRS-THIRD PARTY 26 USC 7609 | | [ ] 895 FREEDOM OF INFORMATION ACT |
| | ACTIONS UNDER STATUTES | [ ] 791 EMPL RET INC SECURITY ACT (ERISA) | | | [ ] 896 ARBITRATION |
| | CIVIL RIGHTS | | | | |
| [ ] 210 LAND CONDEMNATION | [ ] 440 OTHER CIVIL RIGHTS (Non-Prisoner) | IMMIGRATION | | | [ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION |
| [ ] 220 FORECLOSURE | [ ] 441 VOTING | [ ] 462 NATURALIZATION APPLICATION | | | |
| [ ] 230 RENT LEASE & EJECTMENT | [ ] 442 EMPLOYMENT | | | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 240 TORTS TO LAND | [ ] 443 HOUSING/ ACCOMMODATIONS | [ ] 465 OTHER IMMIGRATION ACTIONS | | | |
| [ ] 245 TORT PRODUCT LIABILITY | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | PRISONER CIVIL RIGHTS | | | |
| [ ] 290 ALL OTHER REAL PROPERTY | [ ] 446 AMERICANS WITH DISABILITIES -OTHER | [ ] 550 CIVIL RIGHTS | | | |
| | [ ] 448 EDUCATION | [ ] 555 PRISON CONDITION | | | |
| | | [ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT | | | |

*Check if demanded in complaint:*

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y. AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

DEMAND $_____  OTHER _____    JUDGE Judge John G. Koeltl    DOCKET NUMBER 1:14-cv-08084

*Check YES only if demanded in complaint*
JURY DEMAND: [x] YES [ ] NO

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

*(PLACE AN x IN ONE BOX ONLY)* **ORIGIN**

[x] 1 Original Proceeding   [ ] 2 Removed from State Court   [ ] 3 Remanded from Appellate Court   [ ] 4 Reinstated or Reopened   [ ] 5 Transferred from (Specify District)   [ ] 6 Multidistrict Litigation (Transferred)   [ ] 7 Appeal to District Judge from Magistrate Judge

[ ] a. **all parties represented**

[ ] b. **At least one party is pro se.**

[ ] 8 Multidistrict Litigation (Direct File)

*(PLACE AN x IN ONE BOX ONLY)* **BASIS OF JURISDICTION**   *IF DIVERSITY, INDICATE CITIZENSHIP BELOW.*

[ ] 1 U.S. PLAINTIFF   [ ] 2 U.S. DEFENDANT   [x] 3 FEDERAL QUESTION (U.S. NOT A PARTY)   [ ] 4 DIVERSITY

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF DEF | | PTF DEF | | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 [ ] 4 | FOREIGN NATION | [ ] 6 [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Eli Verschleiser - 40 Wall Street, 60th Floor, New York New York 10005

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

Jacob Frydman -- 75 Wall Street, New York NY 10005

Craig Gould - 200 Vesey St, 24th Floor, New York, New York 10281

Levick Strategic Communications, LP - 122 East 42nd Street New York, NY 10168

Eric Lebson -- 122 East 42nd Street New York, NY 10168

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Philip Alexander Veen

**COURTHOUSE ASSIGNMENT**

I hereby certify that this case should be assigned to the courthouse indicated below pursuant to Local Rule for Division of Business 18, 20 or 21.

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   [ ] WHITE PLAINS   [x] MANHATTAN

DATE 1/11/2022   SIGNATURE OF ATTORNEY OF RECORD

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[ ] YES (DATE ADMITTED Mo. _____ Yr. _____)

RECEIPT # _____   Attorney Bar Code # _____

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

Clear Form   Save   Print

Levick Strategic Communications, LP
122 East 42nd Street
New York, NY 10168

Eli Verschleiser
40 Wall Street, 60th Floor
New York New York 10005


Craig Gould
200 Vesey St, 24th Floor
New York, New York 10281

Eli Verschleiser
40 Wall Street, 60th Floor
New York New York 10005


Jacob Frydman
75 Wall Street
New York NY 10005

Eli Verschleiser
40 Wall Street, 60th Floor
New York New York 10005


Daniel Edelman
747 Chestnut Ridge Road
Chestnut Ridge, NY 10977

Eli Verschleiser
40 Wall Street, 60th Floor
New York New York 10005


Andrew W. Hayes
43 W 43rd St
New York, NY 10036-7424

Eli Verschleiser
40 Wall Street, 60th Floor
New York New York 10005


United Realty Partners LLC
60 Broad Street, 34th Floor
New York, NY

Eli Verschleiser
40 Wall Street, 60th Floor
New York New York 10005

Nicolae Constantinescu
3033 32nd Street, Apt. 1D
Astoria, New York 11102

Eli Verschleiser
40 Wall Street, 60th Floor
New York New York 10005


Mercer Street Partners
7 World Trade Center, 150 Greenwich St Fl 10
New York, NY 10007-2381

Eli Verschleiser
40 Wall Street, 60th Floor
New York New York 10005


Monica Libin Frydman
75 Wall Street
New York NY 10005

Eli Verschleiser
40 Wall Street, 60th Floor
New York New York 10005


Alexander Libin
7 World Trade Center, 150 Greenwich St Fl 10
New York, NY 10007-2381

Eli Verschleiser
40 Wall Street, 60th Floor
New York New York 10005


Eric Lebson
122 East 42nd Street
New York, NY 10168

Eli Verschleiser
40 Wall Street, 60th Floor
New York New York 10005


Lanny Davis
122 East 42nd Street
New York, NY 10168

Eli Verschleiser
40 Wall Street, 60th Floor
New York New York 10005

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X
 ELI VERSCHLEISER,

                                            Plaintiff,
                                                                    Index Number:

                          - against -

JACOB FRYDMAN, LANNY DAVIS, CRAIG GOULD, FIRST
CAPITAL REAL ESTATE INVESTMENTS, LLC, FIRST
CAPITAL REAL ESTATE TRUST, INC, ALEXANDER          **VERIFIED COMPLAINT**
LIBIN, DANIEL EDELMAN, ANDREW W. HAYES,
MERCER STREET PARTNERS, MONICA LIBIN FRYDMAN,
JACOB FRYDMAN 2000 IRREVOCABLE TRUST, MONICA       **JURY DEMAND**
LIBIN 2000 IRREVOCABLE TRUST, LEVICK STRATEGIC
COMMUNICATIONS, LP, ERIC LEBSON, NICOLAE
CONSTANTINESCU, PHILIP ALEXANDER VEEN, UNITED
REALTY ADVISORS, LP, UNITED REALTY PARTNERS
LLC, JFURTI, LLC, LEDGEROCK LLC, and JOHN DOES 1
through 15 inclusive,
                                            Defendants.

 ---------------------------------------------------------------------------X

        Plaintiff ELI VERSCHLEISER ("Plaintiff"), complaining of Defendants JACOB

FRYDMAN, LANNY DAVIS, CRAIG GOULD, FIRST CAPITAL REAL ESTATE

INVESTMENTS, LLC, ALEXANDER LIBIN, DANIEL EDELMAN, ANDREW W. HAYES,

MERCER STREET PARTNERS, MONICA LIBIN FRYDMAN, LEVICK STRATEGIC

COMMUNICATIONS, LP, ERIC LEBSON, NICOLAE CONSTANTINESCU, PHILIP

ALEXANDER VEEN, UNITED REALTY PARTNERS LLC, JFURTI, LLC, LEDGEROCK

LLC and JOHN DOES 1 through 15, as and for their Complaint allege as follows:

                          **PRELIMINARY STATEMENT**

    1.    Through its organization and structure of sham professional corporations, dummy and

shell companies, the enlistment of an expansive support staff utilizing attorneys, Jacob Frydman

1

("Mastermind") and other defendants used the judicial system to steal hundreds of millions of dollars through various entities it owned and controlled within and without the United States. This lawsuit seeks to recover damages, which resulted from the concerted and malignant efforts of those defendants.

2.   Mr. Jacob Frydman, the Mastermind, has been on a mission to destroy me and my business.

3.   As a non-practicing attorney, he has been able to manipulate and inundate the court system with frivolous filings and extort money from those that cannot adequately defend themselves.

4.   Frydman's entourage of lawyers, including Mr. Robert Rimberg, Mr. Neal Brickman, Mr. Daniel Edelman, Mr. Andrew Hayes and Mr. Lanny Davis are associates of Mr. Frydman, who were evidently solicited by Mr. Frydman to manipulate the court system and others.

5.   Mr. Davis published statements that had no bases whatsoever, but because they were made by Mr. Davis, these statements were taken at face-value. As we have seen from recent events, Mr. Davis is a far cry from being a reliable source.

6.   Mr. Robert Rimberg became associated with Mr. Frydman when Mr. Frydman sought to sell certain assets, in an effort to thwart the reach of a judgment. Recently, Mr. Rimberg, another former attorney, was indicted by the Court for his involvement with a conspiracy to launder money for a narcotics trafficking enterprise.

7.   As described in detail below, Frydman, Mr. Davis and Mr. Rimberg, all former or current attorneys, have systematically abused and deceived the court system and continue to manipulate the courts, which has led to damages in excess of $100+ million dollars to me and my businesses. Only recently has the law caught up to Mr. Davis and Mr. Rimberg, but Frydman has been able to outwit the court system – at least until now.

8.   This action is for civil damages under the Racketeer Influenced and Corrupt Organizations

Act, 18 U.S.C. § 1961 et seq. ("RICO") against the defendants named herein, who have acted singly and also have conspired through a common enterprise to exploit their control and influence over the individuals, companies, and organizations for personal gain and to the detriment of Plaintiff.

9.   The defendants and their co-conspirators are a group of persons associated together for the common purpose of carrying out an ongoing criminal enterprise, as described in the paragraphs of this Complaint; namely, through a multi-faceted campaign of hacking, fraud, threats, theft, lies and corruption.

10. In doing so, defendants have engaged in a series of clandestine illegal activities, including computer fraud, hacking, wire fraud, bank fraud, securities fraud, securities law violations, bank law violations, mortgage fraud, and common law violations. These activities comprise certain predicate acts of racketeering, including wire fraud, mail fraud and misrepresentation, to obtain the property of the Plaintiff and others by means of false and fraudulent pretenses in direct violation of law.

11. While it has been known for years that defendant Jacob Frydman is a dishonest businessman, the evidence of many of these wrongdoings has been collected over the past few years. In addition, to a recent finding by a judge that found defendant Frydman had committed fraud by using his entities to funnel money, most of Frydman's wrongdoings and the patterns of activity that he is involved in, easily go unnoticed because of his ability to use the corporate shield to mask his identity and strong arm his adversaries into settlement with iron-clad confidentiality agreements.

12. The problem that Frydman faced with the Plaintiff herein, is that Plaintiff refused to cave to the illegal and bad faith demands and admit to false accusations orchestrated by Frydman and

his co-conspirators.

13. Nonetheless, the problem with a lie is that once it has been broadcast, it cannot be undone. Defendants' disregard for the judicial system, the truth and their propensity to spread false accusations against Plaintiff and other related individuals has resulted in millions of dollars of unnecessary legal fees, the expense of needless resources by our judicial department, and, ultimately, the demise of a company.

14. Defendants have made false accusations in multiple forums, including as officers of the court, without any recourse. Defendants' escapade through extortion, smear campaigns and defamatory accusations must stop now. As set forth herein, but for Defendants' actions, Plaintiff's businesses would be alive and well, he would not have incurred millions of dollars in needless legal fees, would not have been forced to defend his good reputation in the court of public opinion. While Frydman, a former litigator, who is no stranger to the court system and has been involved in over 200+ judicial proceedings (attached as **Exhibit A** is a partial copy of Frydman's litigation history), has the ability to litigate without much expense.

15. The defendants in this criminal enterprise ultimately rely on threats of litigation and threats of economic harm to force the victim investors to abandon their lost money once the scheme has been uncovered by the victims or the victims have exhausted their financial resources as a result of the conduct of the enterprise.

16. Thus, in addition to the damages that defendants have caused on private individuals, Frydman with the other defendants, as an enterprise engaged in a pattern of fraudulent activity that has wreaked havoc on the court system and used the court system to endorse these lies.

**JURISDICTION AND VENUE**

17. Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims.

18. This Court has supplemental jurisdiction over Plaintiff's state law and common law Claims pursuant to 28 U.S.C. § 1367 (a), which claims are so related to Plaintiffs' federal claims as to form part of the same case or controversy.

19. Venue in this district is proper pursuant to 28 U.S.C § 1965 (a) because Defendants reside, are found, have an agent, or transact their affair in this District.

20. Venue in this District is also proper under 28 U.S.C. § 1965(b) because the ends of justice require that any defendant residing in another District be brought before this Court.

21. Venue is proper under 28 U.S.C. §1391 (b) as well in that a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

22. Plaintiff Eli Verschleiser is an individual, maintains his principal place of business within this District, and is a citizen and resident of the State of New York.

23. Defendant Jacob Frydman is a citizen and resident of the State of New York and maintains residences at 75 Wall Street, New York NY 10005, and 46 Ledgerock Lane, Hyde Park NY 12538.

24. Defendant Craig Gould is a citizen and resident of the State of New York, and currently serves as the CEO of Cabot Lodge Securities LLC ("CLS"), with an office located at 200 Vesey St, 24th Floor, New York, NY 10281.

25. On information and belief, Defendant Levick Strategic Communications, LP ("Levick") is a Delaware company, with offices located at 1900 M Street, NW Washington, DC 20036 and 122 East 42nd Street New York, NY 10168.

On information and belief, Defendant Eric Lebson works at Levick Strategic Communications, LP ("Levick") and maintains an office at 1900 M Street, NW Washington, DC 20036 and 122 East 42nd Street New York, NY 10168.

26. On information and belief, Defendant Alexander Libin is a citizen and resident of the State of New York and maintains an office at 7 World Trade Center, 150 Greenwich St Fl 10, New York, NY 10007-2381.

27. Defendant Mercer Street Partners is located at 7 World Trade Center, 150 Greenwich St, Fl 10, New York, NY 10007-2381.

28. Defendant Monica Libin Frydman is a citizen and resident of the State of New York and maintains residences at 75 Wall Street, New York NY 10005, and 46 Ledgerock Lane, Hyde Park NY 12538.

29. Defendant Jacob Frydman 2000 Irrevocable Trust (the "JF Trust") is a New Jersey trust whose registered and operating addresses are unknown, but since Mr. Frydman is, by his own admission, the sole trustee and a beneficiary of the JF Trust and takes actions related to the JF Trust from New York, the JF Trust can be served through Frydman.

30. Monica Libin 2000 Irrevocable Trust (the "ML Trust"; Monica Libin is Mr. Frydman's wife) is a New Jersey trust whose registered and operating addresses are unknown to Judgment Creditor, but since Frydman is, by his own admission, the sole trustee and takes actions as a trustee related to the ML Trust in New York, the ML Trust can be served through Frydman. See **Exhibit B**.

31. On information and belief, Defendant First Capital Real Estate Investments, LLC, is a company that was organized and currently exists under the laws of the State of California, and maintains its principal place of business in New York, NY.

32. On information and belief, First Capital Real Estate Trust, Inc. is a company that was organized and currently exists under the laws of the State of Maryland, and maintains its principal place of business in New York, NY. First Capital Real Estate Trust, Inc. and First Capital Real Estate Investments, LLC shall collectively be referred to hereinafter as the "First Capital Defendants."

33. On information and belief, Defendant Nicolae Constantinescu ("Constantinescu") is a citizen and resident of the State of New York, who maintains residences at 3033 32nd Street, Apt. 1D, Astoria, New York 11102.

34. Defendant Philip Alexander Veen ("Veen") is a citizen of the United States of America, and is believed to reside part-time in the State of Washington and part-time in the country of Ukraine, where he purportedly operates an information technology (IT) company and a modeling agency.

35. United Realty Advisors, LP is a Delaware company that maintained an office at 60 Broad Street, 34th Floor, New York, NY, and at the direction and control of Defendant Jacob Frydman.

36. United Realty Partners LLC, is a Delaware company, that maintained an office at 60 Broad Street, 34th Floor, New York, NY, and was part of the "United Realty Companies" umbrella that were subsidiaries to or associated with United Realty Advisors, LP - including United Realty Trust, Inc., which was a public Real Estate Investment Trust ("REIT"), and an entity used by Defendant Jacob Frydman to raise monies from the unsuspecting public purportedly to invest in real estate. United Realty Advisors, LP along with all of its subsidiaries and the associated United Realty Companies, including but not limited to United Realty Partners, LLC and United Realty Trust, Inc., shall be

referred to collectively hereinafter as "United Realty." The First Capital Defendants acquired United Realty and are therefore its successors in interest.

37.     On information and belief, defendant Daniel Edelman is an individual who resides in New Jersey and maintains an office at 747 Chestnut Ridge Road Chestnut Ridge, NY 10977.

38.     On information and belief, defendant Andrew W. Hayes is an individual who resides in the State of Connecticut and maintains an office at 43 W 43rd St, New York, NY 10036-7424.

39.     On information and belief, Defendant JFURTI, LLC is a Delaware limited liability company under the exclusive control of Defendant Jacob Frydman, with its principal place of business in the State of New York.

40. Ledgerock, LLC is a New York limited liability company that maintains an office at 46 Ledgerock Ln, Hyde Park, NY, United States, 12538, and operates at the direction and control of Defendant Jacob Frydman.

41. Plaintiff is ignorant of the true names and capacities of the defendants sued in this Complaint as Does 1 through 15, inclusive, and therefore sue these defendants by such fictitious names. Plaintiff reserves the right to amend their pleading to allege the true names and capacities of the Doe defendants when ascertained. Each of the fictitiously named defendants is responsible in some manner for the conduct alleged in this Complaint, and Plaintiffs' damages are actually and proximately caused by the conduct of such defendants.

42. Upon information and belief, Plaintiff alleges that at all times mentioned herein, Defendants were each employed by, consultants to, or acting as agents of, and/or were co-

conspirators of, Defendants Frydman and/or United Realty, and each was acting as an agent and/or employee or co-conspirator of each other, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each other.

## GENERAL FACTS

### Background and Corporate Structure

43. Plaintiff Eli Verschleiser is the CEO and Chairman of the board of Multi Group of Companies LLC ("Multi" or the "Company"), a private real estate investment and advisory firm. Verschleiser has also been a principal in numerous businesses that invest in, develop, own, operate, manage and/or otherwise deal with real estate which he operates as the "Company."

44. In the summer of 2011, Plaintiff was looking for a partner to run a real estate investment trust. Plaintiff along with Frydman came together to form, and eventually directly and/or indirectly jointly owned, several companies, including a public non-traded REIT named United Realty Trust, Incorporated ("REIT"), an independent Broker-Dealer, Cabot Lodge Securities, LLC., and a series of affiliates. These companies were formed after navigating the industry's regulatory hurdles, and after Plaintiff personally, together with family and friends, invested and or loaned the companies more than $12 Million dollars.

45. In comparison, Frydman invested a nominal sum of less than $1,250,000 which he took out in the form of salaries and expenses.

46. In connection therewith and in pursuit of their various other business interests Plaintiff and Frydman formed more than 20 Entities,[1] and as of December 2, 2013 Plaintiff and Frydman, directly and indirectly, through a variety of affiliates, jointly owned, operated and/or controlled the Entities, including the public REIT and United Realty Advisor, LP, the external advisor to the REIT, CLS, the FINRA member broker dealer which is the dealer manager for the REIT, and Prime United, the financial services holding company which owns CLS.

47. Prior to December 2013 Frydman was CEO and Chairman, and Plaintiff was President. Plaintiff and Frydman were also each a member of the board of directors, of both the REIT and the Advisor, and both of them held management or board positions with each of the other Entities.

48. On information and belief all of the controlled entities named herein that are affiliated with Frydman are directly owned by the JF Trust and/or the ML Trust – asset protection trusts established in New Jersey (collectively the "Trusts"). Frydman is the sole trustee of both Trusts in addition to being the sole manager of the underlying controlled affiliated entities owned by the Trusts.

49. Frydman fraudulently uses the assets listed in the Trusts on his personal financial statement to induce lenders and others to loan or invest monies with him.

---

[1] Those Entities included United Realty; United Realty Advisor Holdings, LLC ("URA Holdings"); United Realty Trust Incorporated (the REIT); United Realty Advisor, L.P.; United Realty Partners, LLC; URA Property Management, LLC; United Realty Capital Markets, LLC; URP Investments, LLC; URTI GP, LLC; URTIGP Investments, LLC; URA Property Management, LLC; URTI LP, LLC; Riverside United Title Agency LLC; Prime United Holdings, LLC; Cabot Lodge Securities, LLC (f/k/a Prime United Securities, LLC); CL Wealth Management, LLC; CL General Agency, LLC; Cabot Lodge Lending, LLC; United Realty America Fund GP, LLC; United Realty America Management, LLC; United Realty America, LLC and United Realty Capital Operating Partnership, L.P.

50. Frydman is sufficiently sophisticated that he brags he is "judgment proof." When counsel in another litigation replied that other debtors had told him the same thing in the past, Frydman replied "you haven't dealt with anyone as smart as me." Frydman uses the numerous companies that he controls, but ostensibly does not own, as piggy banks to regularly pay funds to himself.

**The Separation Agreement**

51. As a result of Frydman's fraud and failure to adequately perform his company duties, amongst other things, and pursuant to the various operating or partnership agreements of those companies, Plaintiff removed Frydman as a manager of United Realty Advisor Holdings, LLC, and terminated Frydman's employment with United Realty (as CEO) for "cause" by serving a termination notice upon Frydman.

52. Because the REIT is a public company with full SEC reporting obligations, the removal of Frydman as manager of URA Holdings and the termination of his employment as CEO of the advisor triggered a four-day time clock to file a Form 8-K with the Securities and Exchange Commission disclosing said events.

53. Frydman did not wish to have the basis of his termination publicly disclosed and sought to negotiate a consensual arrangement which would include the rescinding of the termination.

54. Plaintiff, having all the monetary risk as Plaintiff, his friends, and family, were the majority investors in the Companies, were in a dilemma.

55. In trying to save the millions of dollar investment, Plaintiff, Frydman, and certain of their respective affiliated entities, entered into negotiations and on December 3rd, 2013,

executed a Separation Agreement and numerous Assignment of Membership Interest Agreements (the "Separation Agreement").

56. Pursuant to the Separation Agreement, in exchange for, *inter alia,* Frydman's agreement to pay Plaintiff 50% share of future proceeds in the Entities and for rescinding the termination and removal notices, Plaintiff would voluntarily resign from certain positions or offices held as a manager, officer, director or employee of United Realty, the REIT and many of the other entities jointly owned by Plaintiff and affiliates.

57. Frydman also agreed that for a period of eighteen (18) months following the Separation Date: (i) he will not, alone nor in concert with others, directly or indirectly, employ or solicit the employment of, or assist others in employing or soliciting the employment of, any individual employed by any of the Entities; and (ii) will not disparage or encourage or induce others to disparage Plaintiff or his businesses.

58. From the minute Frydman signed the Separation Agreement he embarked on a mission to destroy Plaintiff and his affiliate businesses through criminal, illegal, and tortious acts as detailed hereafter, with the goal of causing existing and prospective investors, business associates, and selling agents to elect not to invest with, or transact business with, Plaintiff and his businesses.

**Fraud and Unlawful Business Practices by Frydman and Other Defendants**

59. Prior to forming a partnership with defendant Frydman, Plaintiff was unaware of many of Frydman's past dealings or litigations, given Frydman's use of corporations to mask his

identity. It is impossible to know the true extent of corporations that act as his alter ego, because even when he is under sworn testimony, he has attempted to defraud the court.[2]

60. After parting ways, Plaintiff uncovered a vast amount of litigation that cast a bright light on Frydman and his business practices. The common theme that spun its way through many of these litigations or legal proceedings seems to be a theme in the instant action: a case about widespread defamation and the perversion of the legal system to promote Frydman's own wrongful activity, escape liability and as a tool to inflict damage and extort others.

61. The claims are based upon an ongoing series of fraudulent schemes committed by an association of individuals and shell business entities. This association and their schemes are designed to defraud and extort investors. It is ongoing and crosses state lines.

62. The enterprise of defendants is masterminded by Jacob Frydman and a cohort of certain attorneys, namely Daniel Edelman, Neal Brickman and Andrew Hayes, who have enabled him to engage in complex schemes and disguise his wrongdoings.

63. Brickman, his newest recruit, just follows the money and files whatever Frydman throws at him to file.

64. Some of Frydman's dirty laundry recently came to light when a bankruptcy proceeding that involved one of Frydman's entities and Mr. Andrew Hayes came to a head.

---

[2] Recently, a judge found that Frydman had been involved in fraud because he was using his entities to funnel assets, while claiming he did not have a real relationship with those entities. *See* Decision and Order by Justice Engoron dated May 24, 2017 in 8430985 *Canada, Inc. v. JFURTI, LLC*, Index No. 154932/2016, ECF Dkt. No. 93.

65. In a proceeding in Bankruptcy Court (Deluxe Building Solutions, LLC, 5:21-bk-00534-HWV), Mr. Hayes let the cat out of the bag and disclosed Mr. Frydman's schemes that involved use of the judicial system and others.

66. Mr. Hayes stated himself in another matter: "Mr. Frydman has filed two motions, which in essence, accuse me of somehow concocting an illegal and unethical bankruptcy filing for nefarious purposes." See the Court Transcript from June 30, 2021 in the case captioned Winter Investors LLC v Scott Panzer, 14cv6852.

67. In a special proceeding file in the Supreme Court for New York County, captioned 8430985 *Canada, Inc. v. JFURTI, LLC*, Index No. 154932/2016, Justice Arthur Engoron found that Frydman had been involved in fraud because he was using his entities to funnel assets, while claiming he did not have a real relationship with those entities. *See* Decision and Order, dated May 24, 2017, attached hereto as **Exhibit C.**

68. Justice Engoron's findings were unequivocal, stating:

> It is apparent from the record that Frydman's conveyance of the subject funds to JFURTI was only one in a series of transactions undertaken as part of an "asset protection plan" devised by Frydman to place FCA's assets beyond petitioner's reach.  The lack of good faith on Frydman's part, as transferor, affords a sufficient basis to set aside this transfer as constructively fraudulent. … The record reflects that respondents fraudulently conveyed FCA's funds when, instead of using any portion of the $2,500,000 to repay the Judgment against FCA, Frydman pocketed the funds, by way of transferring them to JFURTI, one of his wholly-owned affiliated companies. Frydman has not ***hoodwinked*** the Court into believing that he was unaware that the conveyance would impact FCA's ability to repay the Judgment.

*Id*.

69. Frydman's is infamous for his abusive use of the judicial system and masking his identity through the use of corporate shells, and scorched earth practices in extorting property, money, or other forms of consideration from his adversaries.

70. More recently Frydman has decided to change his business model slightly and extort his competition or adversaries for claims related to alleged RICO violations, as he understood the devastating impact it could have on a person's career.[3]

### The RICO Enterprise

71. The RICO Enterprise is comprised of the United Realty entities, which includes the defendants who were all either: (1) employees of United Realty, (2) individuals working under the direction and control of United Realty, which was operated at the direction of Frydman, or (3) successors in interest to United Realty.

72. In the alternative, the RICO Enterprise is comprised of all of the Defendants and their co-conspirators, who constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) as a group of persons associated together in fact, through their common relationship with Defendant Frydman and United Realty, and  for the common purpose of carrying out an ongoing criminal enterprise, as described in the paragraphs of this complaint; namely, though a multi-faceted campaign of wire fraud, threats, hacking, lies, theft and corruption.

73. These RICO defendants and their co-conspirators have organized their operation into a cohesive group with specific and assigned responsibilities and a command structure. Over the years they have adapted their scheme to changing circumstances and expanding

---

[3] Frydman recently sued his most former ex-partner, Mr. Suneet Singal, for RICO related violations, as well. The case is captioned *JFURTI, LLC, et al. v. Forum Partners Investment Management, LLC et al.*, Index No. (SDNY 1:16-cv-08633-CM).

the scope and nature of their activities. While the organization of the enterprise has changed over time, and its members may have held different roles at different times, the enterprise has generally been structured to operate as a unit in order to accomplish the goals of the criminal scheme.

74. Each of the RICO Defendants participated in the operation or management of the Enterprise in an effort to further a common purpose of carrying out an ongoing criminal enterprise through a multi-faceted campaign of hacking, wire fraud, threats, lies, theft and corruption against Plaintiff and the public. Furthermore, the Defendants all maintained a relationship with one another through defendant Frydman and United Realty.

75. In 2015, Frydman, through United Realty, employed Lanny Davis ("Davis") and defendant Levick Communications to conduct activities as members of the Enterprise in furtherance of the common effort to defraud the public and steal from Plaintiff through means of wire fraud.

76. Around the same time, Defendants Constantinescu, Craig Gould, and Alex Libin, who were employees of United Realty under the control of Frydman, were also recruited as members of the Enterprise to conduct activities in furtherance of the common effort to defraud the public and steal from Plaintiff through means of wire fraud.

77. Around the fall of 2015, defendant Veen was recruited by Frydman as a member of the Enterprise to conduct activities in furtherance of the common effort to defraud the public and steal from Plaintiff through means of wire fraud.

78. JFURTI, LLC is a member of the Enterprise as an acting officer of United Realty, through which Frydman asserts his control of United Realty and its employees.

79. Around the fall of 2015, the First Capital Defendants acquired United Realty and became its successors in interest.

80. The Defendants all maintained a lengthy relationship with Frydman and United Realty – ranging anywhere from several months to several years. A number of the Defendants continue to maintain a relationship with Frydman to date. The longevity of the Defendants' respective relationships with Frydman and United Realty are sufficient to permit the defendants to pursue the common unlawful purpose of the Enterprise.

81. At all relevant times, the Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

82. Frydman is or was, on information and belief, the direct or indirect owner, and principal control person of United Realty.

83. According to the United Realty website, United Realty is a privately held real estate investment and advisory firm. The firm invests in and develops real properties for its own account, joint ventures with others, provides strategic advice to clients on complex real estate transactions, and through its affiliates, sponsors and advises Real Estate Investment Trusts.

84. United Realty is an umbrella entity which acts as the enterprise overseeing the other entities which are affiliates of Frydman.

85. The United Realty Enterprise is comprised of other persons with various employment or contractor relationships, including without limitation the Defendants.

86. The United Realty Enterprise has an existence apart from and beyond the racketeering activity complained of in this action and is an entity distinct from the person Jacob Frydman and the remaining defendants.

**Pattern of Racketeering Activity**

87. The RICO Defendants conducted or participated, directly or indirectly, in the conduct,

    management, or operation of the Enterprise's affairs through a "pattern of racketeering

    activity" within the meaning of 18 U.S.C. 1961(5) and in violation of 18 U.S.C. §

    1962(c), to wit:

    (a) The predicate acts all occurred after the effective date of RICO and more than two such
    acts occurred within ten years of one another. The predicate acts were otherwise
    interrelated by distinguishing characteristics and were not isolated events.

    (b) All of the predicate acts described herein were continuous so as to form a pattern of
    racketeering activity in that Defendants, acting in concert, engaged in the wrongful acts
    over a substantial period of time and/or continue or threaten to continue because such
    conduct has become a regular way of conducting Defendants' on-going illegal, extortionate
    activities.

**Pattern of Racketeering Activity: Extortion in Violation of Hobbs Act, 18 U.S.C. § 1951**

88. In a case currently pending before this Court, captioned *United Realty Advisors, LP, et al;.*

    *v. Verschleiser, et al.* (Index No. 14-cv-5903-JGK), Frydman threatened to harm Plaintiffs

    friends and family, the limited partners by including them in this RICO case if they did not

    withdraw their claims.

89. Frydman authored a letter to the limited partners, which read as follows:

    > *Given your various involvements in the real estate business, your need to
    > obtain mortgage financing, and with respect to at least some of you, in
    > consideration of the boards and businesses with which you are affiliated,
    > you may want to think about the downside risk of being named in a RICO
    > complaint and the likelihood that it will impact your ability to continue to
    > transact certain types of business. I also assume that you will have certain
    > disclosure obligations which will be triggered by your being named as a
    > defendant in that action.*

90. Frydman explained that he could litigate with them ad nauseam because he was an

    experienced attorney representing himself pro se:

> *You have asserted that I am involved in 92 litigations, and irrespective of the number, I acknowledge that I am well experienced in such matters, and believe that I have the ability, on my own, without incurring costs for my time, to litigate with you for as long as it takes to right the wrongs which I believe you have now attached yourselves to.*[4]

91. After naming the additional defendants in the Frydman Action, Frydman then switched to phase two of his strategy, which was to use the law suit as leverage to coerce them into settlement, which would often include prohibiting the settling parties from communicating with Plaintiff or doing business with him.

92. This was Frydman's and the enterprises' strategy: isolate Plaintiff from his friends and family and litigate him until he would have to forfeit.

93. In another instance, the Defendants wrongfully and without authorization hacked into Plaintiff's computers and obtained personal and private information in addition to Plaintiffs contacts ("Email List") for persons with whom Plaintiff was conducting business.

94. On April 27, 2015, the Defendants then e-mailed the individuals on the Email List a link for a website that, as explained further in paragraphs 109 through 130 below, Frydman and other Defendants created - which contained untrue, disparaging, and libelous information - all in furtherance of the Enterprise's scheme to defraud and pattern of racketeering.

95. Through that email, the defendants encouraged those individuals on the Email List not to transact business with Plaintiff.

---

[4] The use of litigation for ulterior motives is repeated in most, if not all Frydman's lawsuits. He initiated or has been involved more than 175 lawsuits with business partners, investors, contractors, vendors and affiliates.

96. Numerous individuals and companies have in fact not done business with Plaintiff after reading the emails.

97. The Defendants acted knowingly, maliciously, and with intent to defraud - in violation of the Computer Fraud and Abuse Act (the CFAA, 18 U.S.C. § 1030), and the Electronic Communications Privacy Act (the ECPA, 18 U.S.C. § 2510 et. seq.).

98. Through Defendants' illegal and tortious acts as herein set forth, Plaintiffs have been denied valuable business opportunities, and they have and will continue to suffer damage to their business and property and lose further opportunities.

99. Plaintiffs have also suffered irreparable damage to their business reputation and goodwill.

100.    Another example involved the former Chief of Compliance Officer, Albert Akerman ("Akerman"), of the Broker Dealer, Cabot Lodge Securities, LLC ("BD") and United Realty Trust uncovered fraudulent activities and noticed numerous questionable financial transactions by Frydman.

101.    After questioning defendant Craig Gould, the CEO of the BD, and Frydman numerous times the former Chief of Compliance received no real answers from them.

102.    Being that Plaintiff hired the former Chief of Compliance and the fact that the former Chief of Compliance had the knowledge that Plaintiff owned 50% in all the Companies, the former Chief of Compliance approached the Plaintiff to ask for assistance.

103.    Immediately thereafter the former Chief of Compliance officer was fired by Defendants, Frydman and Gould.

104.     Frydman then began his systematic mafia and thug-like actions of extortion by continuously threatening the former Chief of Compliance officer to retract a public whistleblower letter he had written. Frydman said, "I will skin you like a fish", "I will sue you until the day you die," and threatened to file negative information with FINRA and mark up the former Chief of Compliance officer's U5 which he subsequently did in fact do.

105.     Faced without an alternative, or means to defend such a lawsuit, Akerman settled with Frydman wherein Frydman agreed to not sue Akerman, so long as he signed letters retracting the initial Whistleblower letters to FINRA and the SEC detailing the fraud taking place at the direction of Frydman and Gould.

106.     Akerman issued the letter as agreed-upon, but immediately after the retraction letter was issued by Akerman, and Frydman and Gould had extorted him to the extent possible, Frydman filed a lawsuit against him.

107.     Forced to spend hundreds of thousands of dollars in legal fees the case against Akerman was finally dismissed.

108.     Frydman's unlawful and coercive tactics have enabled him to pressure others into joining his scheme, for fear that they would otherwise face the devastating consequences that flow from being sued by him.

109.     In one such example, Frydman named an individual known as Alexander Veen ("Veen") as a defendant in a RICO action. Frydman and Veen later entered into an agreement titled as a settlement agreement and consulting agreement, wherein Frydman agreed not pursue Veen any further. Frydman then paid Veen  hundreds of thousands of dollars to testify against Plaintiff. In addition to which Frydman offered a percentage of

Frydman's winnings if Frydman were to prevail in his lawsuit against Plaintiff in exchange for Veen's conduct in furtherance of the Enterprise's scheme to defraud and pattern of racketeering. Attached as **Exhibit D** respectively, is a copy of the Settlement Agreement and Consulting Agreement between Frydman and Veen.

110.     To ensure that Veen would comply and follow through with the wrongful, unethical and unlawful acts Frydman requested from him, Frydman agreed to pay Veen in stages, which amounted to a total agreed upon sum of $275,000.00, plus 20% of any winnings Frydman receives from his lawsuit against Plaintiff, plus the cost of airfare and accommodations for Veen to travel to New York to help prepare his testimony for depositions and trial. Frydman's agreement with Veen, and payments to Veen, which were purportedly orchestrated by him and his attorneys, are in violation of New York State law, federal law, and public policy.

111.     Frydman also assured others that if they were to go along with him, and testify against the Plaintiff he would pay them tens of thousands of dollars.

112.     As described herein, defendants have engineered a wide-ranging campaign of public attacks based on false and misleading statements, trumped up civil charges, fraudulent civil judgments, sham investigations, theft, and ongoing harassment and disruptions of business operations, all with the intent and effect of causing a reasonable fear of economic loss and bankruptcy on the part of Plaintiff(s) in furtherance of the Enterprise's scheme to defraud and pattern of racketeering.

113.     As further described herein, the defendants coerced Plaintiff based upon fraudulent representations, insofar that Plaintiff was forced to relinquish property and legal interests if Plaintiff did not succumb to Defendant's unlawful threats of frivolous

22

litigation and false filings with the Securities and Exchange Commission ("SEC") in addition to his monetary and legal demand, defendants tortuously interrupted business interactions of Plaintiff.

114.     Between November 2013 and January 2014, Defendants conspired to fraudulently induce unreasonable and unwarranted settlements, injunctions, and judgments.

115.     Plaintiff relied on representations made to him by Mr. Martin Bell, an attorney who unbeknownst to Plaintiff at the time was acting at Frydman's direction.

116. As a result of Defendant's representations made directly to Plaintiff or indirectly through Mr. Martin Bell, as well as the wrongful threats of false SEC reporting and frivolous litigation, Plaintiff released certain management positions and entered into the Separation Agreement and assigned certain Membership Interests Purchase and Sale Agreement, dated December 3, 2013 ("PSA").

117. Defendants continue to wrongfully induce lucrative settlements by threatening litigation or offering to pay for testimony.

118.  Accordingly, the Defendants have unlawfully obstructed, delayed, and affected -- and attempted to obstruct, delay, and affect -- commerce as that term is defined in 18 U.S.C. § 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in 18 U.S.C. § 1951, in that the Defendants attempted to induce Plaintiff to consent to relinquish property through the wrongful use of actual and threatened force, violence and fear -- including fear of economic loss.

119. Defendants' acts constitute extortion in violation of the Hobbs Act, 18. U.S.C. §1951, which states "Whoever in any way or degree obstructs, delays, or affects commerce or

the movement of any article or commodity in commerce by robbery or extortion or attempts to conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned for not more than twenty years, or both".

**The Shell Game**

120.  A large part of the Mastermind's scheme is using entities to hide his identity and allow him to keep out of the reach of his creditors.

121.  The Shell Game has allowed Frydman to build a house on the Hudson River, which is owned by Ledgrock LLC, and which he values at close to $50 million dollars, but because of his manipulation of the judicial system and his ability to use shells to engage vendors he has avoided paying contractors and other vendors, some of whom were forced into bankruptcy. See **Exhibit E** (NY Post Article)

122. For instance, in 2013, Frydman received $550,932 from Hudson York Capital, LLC, $809,267 from Winter Investors LLC. Ledgerock LLC is a particularly egregious example of how Mr. Frydman takes the benefits of ownership while trying to shield himself from burdens of actual ownership. Ledgerock LLC owns a 15,000 sq. foot mansion plus 4,800 sq. foot guesthouse that was built partially on wetlands on a zoning variance and overlooks the Hudson River in Hyde Park, New York. On his tax returns, Frydman took personal mortgage interest deductions on a Citibank mortgage of $39,302 in 2012, $65,016 in 2013 and $59,399 in 2014 related to the Ledgerock property. Mr. Frydman claims that he does not own the house, but merely has a right to occupy the house rent-free in exchange for paying the mortgage. There are numerous other arrangements similarly beneficial to Frydman without the burden of ownership.

123. The Courts have noted this as well. The Court in 8430985 Canada Inc. v JFURTI, LLC wrote:

> It is apparent from the record that Frydman's conveyance of the subject funds to Jfurti was only one in a series of transactions undertaken as part of an "asset protection plan" devised by Frydman to place FCA's assets beyond petitioner's reach. The lack of good faith on Frydman's part, as transferor, affords a sufficient basis to set aside this transfer as constructively fraudulent.

124. Frydman's use of these entities, including Ledgerock, LLC, was to avoid his creditors and continue his fraud.

125. Mr. Hayes goes into great length to detail some of this scheme in the statement he filed with the Court in the Bankruptcy action (5:21-bk-00534-HWV) in July 2021:

> Also, after March 25, 2021, I learned Mr. Frydman had acted in accord with his absurd boast to me of that date – he, the self-proclaimed expert of bankruptcy law, was acting as if the Deluxe petition somehow freed him to carry on the Debtor's business under the "iBuilt: brand – raising funds for the very same modular construction business that he had built around the Debtor's name and assets, while leaving that Company's creditors with nothing.

**Pattern of Racketeering Activity: Multiple Instances of Mail and Wire Fraud**

126. As described herein, the Defendants engaged in a wide-ranging scheme or artifice to defraud Plaintiff, various courts of law, and the greater public concerning Plaintiff's purported liabilities by fraudulently omitting evidence and making material misrepresentations with the intent and effect of causing a reasonable fear of economic loss on the part of Plaintiff.

127. In furtherance of their scheme, and as described herein, the Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or cause to be

deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

(a) Electronic wirings and/or mailings between and among the Defendants, Co-Conspirators, other market shareholders, and other third-parties;

(b) communications directed toward U.S. state and federal government officials, regulators and the general public incorporating false and misleading statements; and

(c) electronic filing and service of court papers containing false and misleading statements intended to impede the operation of those courts;

**Court Submissions/Proceedings**

128. In December of 2014, in furtherance of the Enterprise's scheme to defraud and pattern of racketeering, Defendant Gould submitted a declaration dated December 29, 2014 in Federal Court for the Southern District of New York to Judge John J. Koeltl. Therein Gould asserted that on December 16, 2014, Plaintiff approached him at a holiday party and admitted to certain wrong doings, including that he (Plaintiff) was responsible for certain defamatory web postings about Frydman.

129. Gould's assertions are false.

130. Numerous witnesses can attest that Gould was extremely drunk and under the influence of cocaine and possibly other substances.

131. Gould, the CEO of Cabot Lodge Securities, LLC, who refused to respond to a subpoena and consistently evaded service, eventually retained the firm of Goldberg Rimberg, PLLC, whose principal partner, Robert Rimberg a disbarred attorney and convicted felon, was a shareholder in Prime United Holdings, LLC, and/or its wholly owned subsidiary Cabot Lodge Securities, LLC.

132.    Gould admitted to submitting the declaration because he "had to choose a side" – Verschleiser or Frydman. It is no surprise that Gould chose Frydman, who paid Gould's salary (through a string of entities).

133.    More recently, defendants Brickman, Edelman and Hayes were responsible for submitting frivolous filings and manufacturing lawsuits in an effort to facilitate the conspiracy organized by Frydman.

### Press Release and Press Conference (February 23, 2015)

134.    Defendant Levick Communication was engaged by Frydman/United Realty around the beginning of Feb. 2015 to work in furtherance of the Enterprise's scheme to defraud and pattern of racketeering.

135.    In connection with his work for the United Realty Enterprise, Davis issued a press release that stated (among other things):

> "During a national telephonic press conference ("Press Conference") Frydman announced that a letter sent by Al Akerman, the former Compliance Officer of an affiliate company, Cabot Lodge Securities, to the Securities and Exchange Commission complaining about Frydman, URT and affiliated companies, had been "retracted and withdrawn" . . . based on "apparent misrepresentations" by a "third party."

136.    In addition, Frydman said he had evidence pointing to his former business associate, Plaintiff, as the "third party" behind the recanted Akerman SEC letter as well as scurrilous multiple websites attacking him and his companies.

137.    Frydman also said that forensic investigations of the company's computer networks and other evidence suggested that Verschleiser had illegally hacked into the company's email systems.

138.    During the course of the Press Conference, Defendant Lanny Davis stated that he would be seeking a federal and New York State investigation of Plaintiff not only for this possible

illegal hacking, but for possibly being behind fraudulent and anonymous multiple websites that "viciously and scurrilously attack Frydman."

139.    Davis in fact used his influence to have the office of Preet Bharara the then US Attorney for the Southern District of New York open a grand jury investigation into the Plaintiff, ultimately finding no wrongdoings by the Plaintiff.

140.    Davis also stated that they had evidence suggesting that Plaintiff may have fraudulently tried to hide his role in creating those websites."

141.    However, at a later date and under oath in his depositions Davis has responded "*no*" when asked if he "*understood the facts well enough to be comfortable making [the] statement[s]*" in the press release.

142.    Davis also said: "[Defendant] Mr. Libin also sent me a substantial amount of documents in several binders prior to the press conference." He went on to say "*I did not know, did not due diligence -- do due diligence, did not verify the truth of anything, which is why I used words like may, possible, and suggest that I was asserting, believing my client and people who worked for my client, who believed those assertions to be true.*"

### Creation and Publication of the Website & Other Online Postings

143.    Frydman conducted a common enterprise to perpetuate internet scams on the public, and specifically on unsuspecting prospective business associates and investors of Plaintiff using Plaintiff's  name and likeness and the name and marks of Plaintiff's businesses through websites, domains, internet postings and advertisements which are intended to, and which have caused prospective investors and others not to do business with Plaintiff and his businesses.

144.     In today's world, Plaintiff's existing and prospective investors and business associates typically undertake some level of due diligence by searching the internet through web browsing search engines such as Yahoo, Google, and Bing, where, since early 2015 they have encountered a barrage of emails, listing websites, videos, and internet postings created and published, transmitted or distributed by Frydman and/or the other defendants.

145.     For example, the web site known as www.thetruthabouteliverschleiser.com ("Website") has false, libelous, and defamatory content.

146.     On Monday, April 27, 2015 4:51 PM, an e-mail was sent by Frydman or at his direction by one of the other co-conspirators ("E-mail"), from thetruthabouteliverschleiser@gmail.com with a header of "An Introduction to Eli Verschleiser."

147.     Recipients of the E-mail were directed to a website located at www. thetruthabouteliverschleiser.com ("Website"), which purported to state "facts" about Plaintiff.

148.     Said "facts" are untrue, libelous and defamatory in nature.

149.     The Website falsely reflected that Plaintiff was a "thug" and a convicted criminal, among other things.

150.     Frydman has admitted under sworn testimony that he was responsible for the defamatory and libelous Website and that he helped instruct the other Defendants on what content the site should host.

151.     While Frydman was the mastermind behind the Website, he again attempted to abuse the legal system and around the spring of 2015, Frydman employed Attorney Lanny

Davis ("Davis") and Attorney Alex Libin ("Libin") to facilitate the creation and development of the Website.

152.     Frydman sought to have his unlawful conduct protected by attorney-client privileges by working through Davis and Libin.

153.     Davis has admitted that website was created with his participation, supervision, direction around the spring of 2015, and then it was executed and implemented by others, including one or more of Levick employees.

154.     Upon information and belief, Defendant Eric Lebson an employee of Levick was one of the main individuals that implemented the websites.

155.     Davis has also stated that the employees from United who he primarily worked with and received information relating to the accusations against Plaintiff are Frydman and Libin.

156.     By using Davis and Libin, Frydman has been able to avoid any legal consequences for his actions, as according to him and Davis, everything was done under the oversight of Davis and Libin, and therefore he contends that it is protected by attorney-client privilege.[5]

157.     Frydman has paid for these illegal and unlawful acts by sending payments either overseas or to those affiliates located in other states, using wires, checks, or other forms of payment.

158.     In other legal proceedings, Google has made production in reference to the website www.thetruthabouteliverschleiser. com, which lists the billing name and address for ad-

---

[5] Frydman, an attorney himself, learned this lesson from another litigation he is currently involved in that concerns fraud, which is captioned *WA Route 9, LLC v. PAF Capital LLC*.

words purchased as "United Realty, Nick Constantinescu, 60 Broad Street, 34th Floor, New York, New York." The Google Production lists a start-date of March 30, 2015.

159.     Defendant Constantinescu, who was an employee of United Realty under the control of Frydman and Libin has under oath at depositions admitted that, in his role at United Realty, around the spring of 2015, he also paid for the domain name for the Website with company money.

160.     While under the employment of Frydman, Constantinescu admitted to setting up the email truthaboutverschleiser@gmail.com for Frydman and United Realty around the spring of 2015.

161.     Constantinescu admitted to being involved in the posting of certain defamatory videos ("Videos") of Plaintiff, which were provided to Constantinescu by Libin for him to post on the Website.

162.     Constantinescu and/or Libin, or an individual under the control of defendant Levick separately posted the videos on other sites, such as www.youtube.com, at the direction of United Realty personnel.

163.     The Videos, which was made from footage of Plaintiff's deposition testimony, dated on or around July 23, 2014 were and currently are located at https://www.youtube.com/channel/UCkL8NxL3VxYVFnkaDdOAe9A.

164.     These Videos, similar to the Website, falsely reflect Plaintiff as a "thug" and convicted criminal, amongst other things.

165.     Defendants have also conceded to disseminating such defamatory and disparaging videos and online postings through their former legal counsel, Mr. Lanny Davis, so as to avoid the reach of the law.

166.     The Defendants knowingly and intentionally misrepresented and materially omitted statements and reports with the intent to deceive Plaintiff(s), the courts, and the general public.

167.     The Defendants colluded to initiate civil prosecutions of Plaintiff(s) on the basis of the aforementioned statements and representations, which the Defendants knew to be false or misleading. The Defendants disseminated those statements and representations to the general public, and to multiple state and federal agencies and courts, with the intent that those statements be believed and that they form the basis for further public attacks on Plaintiff(s), investigations of Plaintiff(s), and reduction in the value of Plaintiff(s)' assets.

168.     The Defendants' false and misleading statements have been relied on by U.S. state and federal courts and government agencies, Plaintiff, Plaintiff's investors, clients, creditors, and vendors – all of which has caused Plaintiff substantial damages.

169.     Frydman has a long history of using the legal system for unjust and unlawful means.

170.     During 2014-2015 Frydman used his influence with Mr. Cy Vance ("Vance"), the New York County District Attorney to empanel a grand jury to bring criminal proceedings ("Criminal Proceedings") against Plaintiff.

171.     Frydman used wires in communicating with Vance.

172.     Notwithstanding the fact that Vance had a prior professional relationship with Frydman, Vance did not recuse himself from the Criminal Proceedings.

173.     Ultimately, the grand jury never found any wrongdoings by Plaintiff.

**Pattern of Racketeering Activity: Obstruction of Justice**

174.     In a concerted effort to thwart Plaintiff's attempts to uncover the truth, the Defendants, and their counsel, have habitually filed through wire means, or caused to be

filed through wire means, documents, including declarations sworn to under penalty for perjury, that falsely represent facts and circumstances.

175.     These false declarations and/or affidavits including *interalia* a declaration of Mr. Craig Gould wherein he falsely asserts that Plaintiff admitted to him that he was responsible for certain allegedly defamatory web postings of Frydman, an affidavit of Veen, wherein Veen asserts that he (Veen) had witnessed Plaintiff "con many people, using various schemes to cheat them out of money and property."

176.     In addition, Defendants have systematically violated section 1512 by influencing certain witnesses, and specifically Veen, Gould, and Constantinescu offering significant sums of money in exchange for testimony or conduct considered to be unethical and/or unlawful.

**Bribery Payments to Alexander Veen in Exchange for Testimony**

177. In 2015, Frydman recruited Veen into the Enterprise through use of electronic wire communications and wire payments, with an aim of furthering the Enterprise's common purpose and pattern of racketeering, including the Enterprise's scheme to defraud.

178. Wire Payments were sent to Veen ("Veen") pursuant to the settlement and consulting agreement ("Consulting Agreement") that Frydman, Veen, Prime United Holdings LLC, and United Realty Advisors LLC entered into. See **Exhibit D** (Consulting Agreement)

179. Pursuant to that certain Consulting Agreement, Frydman agreed to pay Veen (in violation of federal law 18 U.S.C. § 201; New York State law; and public policy): (1) 20% of any recovery collected as a result of a settlement or final non-appealable judgment against Plaintiff as a result of the pending lawsuit and (2) $5,000 for every month the settlement agreement is in effect beginning Sep. 2015 by wire transfer, (3) $75,000 in exchange for,

among other things, Alex Veen making himself available by telephone or other electronic medium to discuss his testimony in the case against Plaintiff, (4) $100,000 for Veen's appearance at a deposition for the case against Plaintiff, and (5) $100,000 for Veen to testify at trial against Plaintiff.

180. The following is a timeline of some of the acts and events involving Veen:

(a) Entering into the contracts on or about 8/14/15

(b) 9/2/15 wire payment from Frydman to Veen of $5,000, between 10/03/15-10/05/15 emails between Frydman and Veen confirming wire payments and discussing an affidavit for Veen to sign, which furthered the Enterprise's scheme to defraud and pattern of racketeering.

(c) 10/5/15 wire payment from Frydman to Veen of $5,000

(d) 11/02/15 meeting between Frydman and Veen in person in Kiev, Russia and wire communications to set up the meeting

(e) 11/4/15 wire payment from Frydman to Veen of $5,000

(f) 11/12/15 email from Frydman to Veen, sending an affidavit for Veen to sign in order to further the Enterprise's scheme to defraud and pattern of racketeering.

(g) 12/2/15 wire payment from Frydman to Veen of $5,000

(h) 2/1/16 wire payment from Frydman to Veen of $5,000

(i) 9/16/16 wire payment from Winter Investors LLC to Veen of $100,000

(j) 8/20/16 email from Veen to Frydman asking if he should give a reporter a "stealthy interview" and requesting a wire payment for a flight purchased for a trip where Veen gave paid-for testimony at a deposition in furtherance of the Enterprise's

34

scheme to defraud and pattern of racketeering. 10/4/16 wire payment from Frydman to Veen of $1,600

(k) 12/9/16 wire payment from Frydman to Veen of $100,000

181. Frydman, after recruiting Veen into the Enterprise through use of electronic wire communications and wire payments with an aim of furthering the Enterprise's scheme to defraud and pattern of racketeering, then attempted to recruit other potential witnesses or parties through Veen.

182. Frydman was well aware that he was prohibited from contacting adverse parties, both as a licensed attorney and because this was an issue that has come up throughout his litigation and he has been reminded of such policies by the court.

183. Notwithstanding the foregoing, on or around September 16, 2016, via wire means over LinkedIn, defendant Veen attempted to recruit Ophir Pinhasi ("Pinhasi"), a defendant in the Frydman Action, in an effort to further the Enterprise's pattern of racketeering and on behalf of Defendant Frydman. Through wire communications, Veen told Pinhasi that if he agrees to cooperate with Frydman, Pinhasi "can walk away from [the case] with some coin and no problems . . . you can work out a settlement agreement."

184. On September 17, 2016, via LinkedIn, Defendant Veen on behalf of Frydman (Frydman being a licensed attorney) convinced Pinhasi to meet with Defendant Frydman privately to discuss the pending case, in violation of the rule against contacting adverse parties.

185. At the meeting Frydman tried to convince Pinhasi to steal Plaintiffs computer and or hard drives by offering Pinhasi large sums of monies.

186. As outlined further herein, Defendants have systematically violated 18 U.S.C. § 1512 because they repeatedly tried to influence certain witnesses, such as Veen and Pinhasi, by

offering significant sums of money through use of wire communications in exchange for testimony or conduct that would further the Enterprise's common purpose, scheme to defraud, and continued racketeering activity.

187. By making these deliberate attempts to corruptly endeavor to influence, obstruct, and impede the due administration of justice, the Defendants have committed multiple instances of obstruction of justice in violation of 18 U.S.C. § 1512.

188. Plaintiff was injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(c).

189. The injuries to Plaintiff caused by reason of the violations of 18 U.S.C. § 1962(c) include but are not limited to damage to the use and enjoyment of its funds, ability to conduct business, credit, licenses, reputation and goodwill that were intended for Plaintiff and his Company's business purposes.

190. Further, these injuries to Plaintiff were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962. Plaintiff is the ultimate victim of the Defendants' unlawful Enterprise. Plaintiff has been injured in its business and property in an amount to be determined at trial.

191. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble damages plus costs and attorneys' fees from the Defendants.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF RICO, 18 U.S.C. 1962(C)
### (Against All Defendants)

192.     Plaintiff realleges and incorporates herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

193.     At all relevant times, Plaintiff is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

194.     At all relevant times, each Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

195.     The Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs; namely, though a multi-faceted campaign of lies, fraud, threats, theft and corruption, to coerce Plaintiff into selling certain interests to Defendants and their co-conspirators at below market compensation. These Defendants and their co-conspirators have organized their operation into a cohesive group with specific and assigned responsibilities and a command structure. Over the years they have adapted their scheme to changing circumstances and expanding the scope and nature of their activities. While the organization of the criminal enterprise has changed over time, and its members may have held different roles at different times, the criminal enterprise has generally been structured to operate as a unit in order to accomplish the goals of the criminal scheme.

196.     The Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "Enterprise." Each of the Defendants participated in the operation or management of the Enterprise.

197.     At all relevant times, the Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

198.     The Defendants conducted or participated, directly or indirectly, in the conduct,

management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. '1961(5) and in violation of 18 U.S.C. § 1962(c), to wit:

(a) The predicate acts all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another. The predicate acts were otherwise interrelated by distinguishing characteristics and were not isolated events, insofar that the acts and actors all sought to destroy Plaintiff's business and reputation through unlawful means;

(b) All of the predicate acts described above were continuous so as to form a pattern of racketeering activity in that Defendants, acting in concert, engaged in the wrongful acts over a substantial period of time and/or continues or threatens to continue because such conduct has become a regular way of conducting Defendants' on-going illegal, extortionate activities.

199.     At all times material to this Complaint, Plaintiff was engaged in interstate and foreign commerce and in an industry, that affects interstate and foreign commerce.

200.     As described herein, the Defendants have engineered a wide-ranging campaign of public attacks based on false and misleading statements, trumped up civil charges, sham investigations, hacking, theft, and ongoing harassment and disruptions of business operations, all with the intent and effect of causing a reasonable fear of economic loss and bankruptcy on the part of Plaintiff.

201.     As described herein, the Defendants illegally took Plaintiff's valuable property interests through threats and intimidation, fraudulently inducing unreasonable and unwarranted settlements, injunctions and judgments; and threatening, intimidating,

defaming, tortuously interfering with business and breaching their fiduciary duties in the prevention of Plaintiff forming partnerships and associations to obtain capital to run the business and the prevention of others from lending monies to Plaintiff all with the intent and effect of causing a reasonable fear of economic loss on the part of Plaintiff.

202.    As described hereinabove, the Defendants have unlawfully obstructed, delayed, and affected -- and attempted to obstruct, delay, and affect -- commerce as that term is defined in 18 U.S.C. § 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in § 1951, in that the Defendants attempted to induce Plaintiff to consent to relinquish property through the wrongful use of actual and threatened force, violence and fear -- including fear of economic loss.

203.     As described herein, the Defendants engaged in a wide-ranging scheme or artifice to defraud Plaintiff(s), various courts of law, and the greater public concerning Plaintiff's purported liabilities by fraudulently omitting evidence and making material misrepresentations all with the intent and effect of causing a reasonable fear of economic loss on the part of Plaintiff.

204.    In furtherance of their scheme and constituting violations of 18 U.S.C. §§ 1341 and 1343, and as described herein, the Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or cause to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

(a) wirings and/or mailings between and among the Defendants, Co-Conspirators, other

market shareholders and outside vendors;

(b) communications directed toward U.S. state and federal government officials and regulators incorporating false and misleading statements; and

(c) electronic filing and service of court papers containing false and misleading statements intended to impede the operation of those courts;

205.    The Defendants knowingly and intentionally misrepresented and materially omitted statements and reports with the intent to deceive Plaintiff(s), the courts, and the general public.

206.    The Defendants colluded to initiate i.) civil prosecutions of Plaintiff on the basis of statements and representations the Defendants knew to be false or misleading, to be disseminated to the general public, and to multiple state and federal agencies and courts, with the intent that those statements be believed and that they form the basis for further public attacks on Plaintiff, investigations of Plaintiff, and reduction in the value of Plaintiff's assets.

207.    The Defendants knowingly engaged in the aforementioned conduct with the intent to generate fear in Plaintiff(s) so that Plaintiff(s) would run a union shop and/or that plaintiff(s) sell their property at unreasonably below market consideration to Defendants or Co-Conspirators.

208.    The Defendants' false and misleading statements have been relied on by U.S. state and federal courts and government agencies, Plaintiff, investors, creditors, vendors, and which has caused Plaintiff substantial damages.

209.    In a concerted effort to thwart Plaintiff(s)' attempts to uncover the truth, the Defendants, and their counsel, have habitually filed or caused to be filed documents,

including declarations sworn to under penalty for perjury, that falsely represent how much Plaintiff(s) owed, that materially omit Defendants' intentional withholding of Plaintiff(s)' Settlement Funds, and that all settlements and judgments including without limitation late fees, legal fees, and penalties were also induced by fraud. They have done so with the full knowledge that these statements were false. By making these deliberate and strategic false representations and material omissions in various pending judicial proceedings, with fill awareness of their consequence and with the specific intent to corruptly endeavor to influence, obstruct, and impede the due administration of justice, the Defendants have committed multiple instances of obstruction of justice in violation if 18 U.S.C. § 1503.

210.    At all times material to this Complaint, Plaintiff was engaged in interstate and foreign commerce and in an industry, that affects interstate and foreign commerce.

211.    Plaintiff was injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(c). The injuries to Plaintiff(s) caused by reason of the violations of 18 U.S.C. § 1962(c) include but are not limited to damage to the use and enjoyment of its funds, ability to conduct business, credit, produce, equipment, furniture, personal possessions, licenses, reputation and goodwill that were intended for Plaintiff and his Company's business purposes.

212.    Further, these injuries to Plaintiff(s) were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962. Plaintiff(s) is the ultimate victim of the Defendants' unlawful Enterprise. Plaintiff has been injured in its business and property in an amount to be determined at trial.

213.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff(s) is entitled to recover treble damages plus costs and attorneys' fees from the Defendants.

214.     WHEREFORE, Plaintiff prays for judgment as set forth below.

## COUNT II

### Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d)

### (Against All Defendants)

215.     Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

216.     The Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

217.     Upon information and belief, the Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

218.     Upon information and belief, the Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

219.     Each Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from plaintiff(s). It was part of the conspiracy that the Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth supra.

220.     Each defendant aided and abetted each alleged predicate act in violation of 18 U.S.C. § 1962(d).

221.     Defendants were associated with the wrongful acts, participated with the intent to

bring their scheme about, and sought by their actions to make the scheme succeed.

222.      As a direct and proximate result of the Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and his Company has been injured in its business and property, including damage to the use and enjoyment of its funds, ability to conduct business, credit, produce, equipment, furniture, personal possessions, licenses, reputation and goodwill that were intended for Plaintiff and his Company's business purposes.

223.      Pursuant to 18 U.S.C. § 1964(c), Plaintiff(s) is entitled to recover treble damages plus costs and attorneys' fees from the Defendants.

224.      WHEREFORE, Plaintiff(s) prays for judgment as set forth below.

## <u>COUNT III</u>

**DIRECT VIOLATIONS OF THE LANHAM ACT, FEDERAL UNFAIR COMPETITION AND FALSE DESIGATION OF ORIGIN 15 U.S.C. § 1125(a)**

**(Against Defendants Frydman, Davis, Veen, Alex Libin, Monica Libin Frydman, Levick, Lebson, and Constinescue)**

225.      The preceding allegations of this Complaint are alleged as fully set forth herein.

226.      This count is against defendants Frydman, Davis, Veen, Alex Libin, Monica Libin Frydman, Levick, Lebson and Constinesceu.

227.      Plaintiff's standing to bring claims under federal Lanham Act and state unfair-competition and trade-practices law is established by the business-competitor relationship among Plaintiff and Defendants Frydman and United Realty and their respective agents, employees and consultants.

228.     As explained above, Frydman and certain other defendants have created, or caused Does 1-15 to create on their behalf, and published and or transmitted, YouTube videos, websites, domains or subdomains, or Internet postings which were created, posted, published and/or transmitted to deceive the public into believing the  false and fraudulent statements made therein about Plaintiff and his businesses, by creating and misusing Plaintiff's name and likeness and the name, likeness and marks of Plaintiff's businesses with the sole intent to cause injury and damage to Plaintiffs, their property and businesses.

229.     If one were to search the internet during the relevant period referenced herein through a search engine such as Google, Bing or Yahoo!, and type in Plaintiff's name, the results generated would include websites, domains or subdomains, Videos on YouTube that prominently display Plaintiff's name and likeness and the names and marks of Plaintiff's businesses which were created directly, or at the direction of Frydman and the other Class A Defendants, with the sole intent and purpose to deceive the persons with whom Plaintiffs do business and the public and cause the public to confuse said websites, domains or subdomains, and postings as "real" or "legitimate", when in fact they are materially false and fraudulent and created or posted with the intent to cause harm and damage to Plaintiffs and their businesses.

230.     These websites, YouTube Videos, blogs postings and advertisements all include Plaintiff's  name, and often also include his likeness.

231.     These websites, YouTube Videos, domains or subdomains, and posts falsely and fraudulently explicitly state that Plaintiff is a, "criminal", "thief", "liar", "hacker" and the like.

232.    Frydman  and  the  other  defendants  referenced herein have  used,  and  are continuing  to  use  false  and  misleading  descriptions  and  representations  of  fact  about Plaintiff and his  businesses  which  are  intended  to  cause  existing  and  prospective investors  and  business associates not  to invest with or transact business  with Plaintiff and his businesses, which false and misleading  statements  reasonably  would  influence the  intended  audience  to  elect  not  to invest with or transact business with Plaintiff, when in fact such statements are inaccurate, false, fraudulent and/or misleading.

233.    The  inaccurate, false, fraudulent  and/or  misleading  statements  made  by Frydman  and  the  other  defendants referenced herein concern  the  nature,  characteristics, and  qualities  of Plaintiff and his businesses and the products and/or or services he offers suitable  investors.

234.    The inaccurate, false, fraudulent and/or misleading statements made by Frydman and  the ·other  defendants referenced herein are  material,  in  that a  significant number of prospective  investors  or  business  associates  who  are  the  intended  audience  of  these inaccurate, false, fraudulent and/or misleading statements would likely attach importance to the said misrepresentations in determining whether to invest with, or transact business with, Plaintiff and his businesses.

235.    An existing or prospective investor considering an investment with Plaintiff or his companies  would  likely,  and  have,  considered  and  be  influenced  by claims that Plaintiff is a thief, criminal, fraudster, scam artist, etc.  in making an investment decision.

236.    Similarly, an existing or prospective business associate, lender or vendor considering a business transaction with Plaintiff or his businesses would likely

45

consider claims that Plaintiff is a criminal, liar, scam artist, etc. would likely be influenced in making a decision as to whether to transact business with Plaintiff or his businesses.

237.     The inaccurate, false, fraudulent and/or misleading representations made by Frydman and the other Defendants as above described are representations regarding commercial matters and were made in commercial advertising or promotion.

238.     The false and misleading statements made by Defendants about Plaintiff and his businesses as above described were made in connection with services and products offered by Plaintiff and his businesses which are used in commerce.

239.     Plaintiff has been and are likely to continue to be damaged by the false and misleading representations made by Defendants as above set forth.

240.     Plaintiffs have not authorized Defendants to use Plaintiff's name or likeness or the name of marks of his businesses in any of said websites, YouTube Videos, domains or subdomains, posts or advertisements.

241.     Plaintiffs have not sponsored or approved any of Defendants' websites, domains or subdomains, emails, posts, and advertisements which wrongly use Plaintiff's name and likeness and the name and marks of his businesses.

242.     Defendants' conduct is likely to cause confusion, mistake or deception as to the affiliation, connection or association of the Defendants' scheme with respect to Plaintiff, and as to the origin, sponsorship or approval of Plaintiff and the services offered by Plaintiff and their businesses, in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(l).

243.     As a result of Defendants' aforesaid conduct, Plaintiff has suffered commercial damage, as well as the continuing loss of the goodwill and reputation established by Plaintiffs in its and their affiliates marks.

244.          As a result of Defendants' violations of Section 43 of the Lanham Act, 15 U.S.C.§ 1125(a)(1), Plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $100 million as a result of, among other things:

(a)  Lenders with whom Plaintiff or their affiliates were negotiating loans, and/or form whom Plaintiff were seeking credit denying new credit to Plaintiffs;

(b) Lenders who issued, applications or indications of interest to lend money to Plaintiff and/or their affiliates terminating such term sheets, applications or indications of interest or on negatively modifying the terms on which such loans would be made;

(c) Sellers of real estate assets with whom Plaintiff was negotiating, and/or had entered into non-disclosure agreements, term sheets and/or letters of intent terminating or electing not to proceed with Plaintiffs with respect to said transactions;

(d)  Otherwise as shall be proved at the trial in this action.

245.     Pursuant to 15 U.S.C. §1125, in assessing damages the court may enter judgment per the circumstances of the case, for treble damages in any sum above the amount found as actual damages, not exceeding three times such amount.

## COUNT IV

## VIOLATIONS OF THE LANHAM ACT INJUNCTIVE RELIEF U.S.C. § 1125(a)

### (Against All Defendants)

246.     The preceding allegations of this Complaint are re-alleged as if fully set forth herein.

247.     This Count is against all Defendants.

248.     By reason of the foregoing, Plaintiffs hereby assert a claim against Defendants for injunctive and monetary relief pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), with regards to the false designation of origin and false descriptions and representations in commerce.

249.     As a result of Defendants' aforesaid conduct, Plaintiffs have suffered commercial damage, as well as the continuing loss of the goodwill and reputation established by Plaintiffs in their businesses and marks.

250.     This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which Plaintiff has no adequate remedy at law.

251.     Plaintiff will continue to suffer irreparable harm unless this Court enjoins Defendants' conduct.

### COUNT V

### FRAUD

### (Against All Defendants)

252.     This count is against Frydman and the other Defendants.

48

253.     The Defendants referenced above intentionally made numerous representations of material facts which were and are untrue, and which Defendants knew to be untrue, and which representations were made with the intent to deceive and for the purpose of being republished and to mislead Plaintiff's existing and prospective investors and business associates and other audiences to which the representations were directed to curtail or not do business with or not invest with Plaintiff, and which were reasonably relied on by the recipients of said representations, thereby depriving Plaintiff of property or legal rights or otherwise causing injury and damage to Plaintiffs.

254.     The conduct of Defendants as above set forth constitutes fraud.

255.     As a result of the fraud committed by Defendants, Plaintiff has been damaged in an amount to be determined at trial believed to be not less than $100 Million.

256.     In addition to such damages, Plaintiff seeks punitive damages as a result of the egregious and/or public nature of the fraud committed by Defendants.

## COUNT VI

### INJURIOUS FALSEHOODS

### (Against All Defendants)

257.     This count is against all Defendants.

258.     Defendants knowingly published false and derogatory matter with respect to Plaintiff's business of a kind to prevent others from dealing with Plaintiff and his businesses or otherwise intending to, and in fact, interfering with Plaintiff's relations with others, to Plaintiff's detriment.

259.     Defendants' conduct as above described constitutes the tort of injurious falsehood in that the statements published by them in websites, domains, emails internet posts and

advertisements, were false and fraudulent, and were published and/or re-published to third persons, with malice, and resulted in special damages.

260.    The statements made were intended to, and did denigrate Plaintiff and the quality of Plaintiff's businesses, and services.

261.    As a direct result of Defendants' commission of the tort of injurious falsehood, Plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $100 million.

262.    In addition, because of the cruel, willful and malicious nature of the foregoing wrongful conduct, Plaintiff is also is entitled to recover punitive damages.


## COUNT VII

## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL OR BUSINESS RELATIONS

### (Against All Defendants)

263.    This Count is against all Defendants.

264.    Plaintiff and his affiliates have had numerous opportunities to enter into contracts with prospective sellers of assets, including, without limitation, real property assets, with Plaintiff, with investors who were considering investing with Plaintiff or their affiliates deals, with lenders considering entering into loan transactions with Plaintiff and their affiliates, with prospective employees and consultants considering entering into agreements with Plaintiff and their affiliates, and with other prospective contractual opportunities.

265.      By virtue of the myriad of wrongs committed by Defendants as complained of here, which includes tortious, intentional, malicious and/or criminal conduct, Frydman and the other Defendants interfered and continue to interfere with Plaintiff's prospective contractual or business relations with investors, employees, contractors, professionals, and others with whom Plaintiff and his businesses pursue contractual or business relationships.

266.      In doing so, Defendants acted with specific purpose and/or intent to harm Plaintiff and did so without proper justification, privilege or consent.

267.      The statements made in websites, YouTube Videos, domains, subdomains, Internet postings and advertisements created, published, posted, disseminated, transmitted and otherwise distributed by Frydman and one or more of the Defendants about Plaintiff and his businesses were false.

268.      Plaintiff's prospective contractual or business relations search the Internet in undertaking due diligence on Plaintiff and his businesses.

269.      Defendants have known that Plaintiffs actively pursue new contractual and business relations.

270.      Through their tortious, intentional, malicious and/or criminal conduct as above set forth, Defendants are tortuously interfering with Plaintiff's prospective contractual or business relations with prospective investors, employees, contractors, professionals and others with whom Plaintiff and their businesses pursue contractual or business relationships.

271.      But for Defendants conduct as above set forth, Plaintiff and his affiliates would have entered into those prospective contracts.

272.    There is no privilege or justification for such conduct.

273.    As a result of such conduct, Plaintiff's prospective contractual or business relationships have been and continue to be exposed as set forth herein, Plaintiff's prospective business relations are exposed repeatedly to false, derogatory, defamatory, negative and intentionally misleading "information" about Plaintiff and his businesses which appear whenever a prospective contractual or business relation undertakes an Internet search.

274.    As a result of the myriad of wrongs committed by Defendants as complained of here, Plaintiff's prospective contractual or business relations are deceived or confused into visiting the websites, domains, Internet postings of Defendants when searching for information on Plaintiff and his businesses.

275.    By virtue of the myriad of wrongs committed by Defendants as complained of here, which includes tortious, intentional, malicious and/or criminal conduct, Defendants knowingly and tortuously interfered, and continue to interfere, with Plaintiff's prospective contractual or business relations with investors, employees, contractors, professionals and others with whom Plaintiff's and their businesses pursue such relations.

276.    In doing so, Defendants acted with specific purpose and/or intent to harm Plaintiff and did so without proper justification, privilege or consent.

277.    The statements made in websites, domains, emails, Internet postings and advertisements created, published, posted, disseminated, transmitted and otherwise distributed by Defendants about Plaintiff and his businesses, including, without limitation, Multi Groups, were and are false.

278.     As a result, Plaintiff has suffered and continue to suffer damages to their prospective contractual or business relations, which would have ripened into actual contractual relations but for the foregoing wrongful conduct of Defendants.

279.     Accordingly, Defendants' conduct constitutes tortious interference with prospective contractual or business relations under the common law.

280.     As a result of that conduct, Plaintiff has been, and absent injunctive relief will continue to be, irreparably harmed.

281.     Plaintiff has no adequate remedy at law for the foregoing wrongful, intentional, malicious and intentional conduct of Defendants.

282.     Defendants' intentional interference with Plaintiff's prospective contractual or business relations have damaged Plaintiff in an amount to be determined at trial believed to be not less than $100 million.

283.     Plaintiff also requests that Defendants  be preliminarily and permanently enjoined from creating, posting, publishing, operating, transmitting and otherwise using websites, domains, emails, subdomains, Internet posts, advertisements and the like which in any way directly or indirectly name or relate to Plaintiff or his businesses.

284.     In addition to such damages, Plaintiffs seek punitive damages as a result of the egregious conduct committed by Defendants.

## COUNT VIII

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Against All Defendants)**

285.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

286.     This Count is against all Defendants.

287.     The wrongful, intentional, malicious and/or criminal actions of Defendants as above described constitute extreme and outrageous conduct, in that it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and should be regarded as atrocious, and utterly intolerable in a civilized society.

288.     Such actions constitute a deliberate and malicious campaign of harassment and intimidation undertaken by Defendants with the intent to cause, or in disregard of a substantial probability of causing, severe emotional distress to Plaintiff.

289.     It is foreseeable that a causal connection would exist between such campaign and the resulting injury to Plaintiff of severe emotional distress.

290.     As a direct and proximate result of Defendants' wrongful, intentional, malicious and/or criminal actions as above described, Plaintiff has suffered and will continue to suffer severe emotional distress.

291.     As a direct and proximate result of Defendants' intentional infliction of emotional distress, Plaintiff has been damaged in an amount to be determined at trial believed to be not less than $1 Billion.

292.     In addition to such damages, Plaintiffs seek punitive damages as a result of the egregious conduct committed by Defendant Frydman and the other Class A Defendants.

## COUNT IX

### PRIMA FACIE TORT

### (Against All Defendants)

293.     The preceding allegations of this Complaint are alleged as if fully set forth herein.

294.      This Count is against all Defendants.

295.      Defendants conduct as above set forth constitutes a prima facie tort, in that such conduct was intentionally undertaken to inflict harm on Plaintiff, resulting in special damages without excuse or justification, by a series of acts that would otherwise be lawful.

296.      Defendants conduct was solely motivated by malevolence towards Plaintiff.

297.      As a direct result of Defendants prima facie torts, Plaintiff has been damaged in an amount to be determined at trial but believed to be not less than $100 million.

298.      In addition to such damages, Plaintiff seeks punitive damages as a result of the egregious conduct and committed by Defendants.

## COUNT X
## VIOLATIONS OF THE CFAA
### 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(4), 1030(a)(5)(C)

299.      The preceding allegations are realleged as if fully set forth here.

300.       This Count is against all Defendants.

301.      Around April of 2015, the Defendants wrongfully hacked into Plaintiff's computer without authorization and obtained contacts ("Email List") for approximately hundreds of persons with whom Plaintiff was conducting business.

302.      On April 27, 2015, the Defendants then e-mailed approximately 300 individuals on the Email List a link for a website that, as explained in paragraphs 109 through 130 above, Frydman and other Defendants created - which contained untrue, disparaging and libelous information - all in furtherance of the Enterprise's scheme to defraud and pattern of racketeering.

303.　　　The value of the Email List obtained was greater than $5,000 in a one-year period.

304.　　　Through that email, the Defendants encouraged the individuals on the Email List not to transact business with Plaintiff.

305.　　　The Defendants acted knowingly, maliciously, and with intent to defraud - in violation of the Computer Fraud and Abuse Act (the CFAA, 18 U.S.C. § 1030).

306.　　　Through Defendants' illegal and tortious acts as herein set forth, Plaintiff has been denied valuable business opportunities, and they have and will continue to suffer damage to their business and property and lose further opportunities.

307.　　　Plaintiff has also suffered irreparable damage to their business reputation and goodwill.

308.　　　As a direct result of Defendants' actions, Plaintiff has been damaged in an amount to be determined at trial but believed to be not less than $100 million.

## COUNT XI
### CONSPIRACY TO VIOLATE THE CFAA -18 U.S.C. §§ 1030(b)

309.　　　The preceding allegations are realleged as if fully set forth here.

310.　　　This Count is against all Defendants.

311.　　　Around April of 2015, the Defendants conspired to violate 18 U.S.C. § 1030(a) by agreeing to intentionally access Plaintiff's protected emails without authorization in violation of 18 U.S.C. § 1030(b), and by committing one or more overt acts in furtherance of the agreement and intentionally participating in the furtherance of a plan or purpose to gain such access.

312.     Such overt acts include actually hacking Plaintiff's computers without authorization, thereby obtaining email address contacts ("Email List") for approximately 300 persons with whom Plaintiff was conducting business.

313.     On April 27, 2015, the Defendants then e-mailed the approximately 300 individuals on the Email List a link for a website that, as explained in paragraphs 109 through 130 above, Frydman and other Defendants created - which contained untrue, disparaging and libelous information - all in furtherance of the Enterprise's scheme to defraud and pattern of racketeering.

314.     Through that email, the Defendants encouraged the individuals on the Email List not to transact business with Verschleiser.

315.     The Defendants acted knowingly, maliciously, and with intent to defraud - in violation of the Computer Fraud and Abuse Act (the CFAA, 18 U.S.C. § 1030).

316.     The value of the Email List obtained was greater than $5,000. As a direct and proximate result of the conspiracy, Defendants caused losses to Plaintiffs exceeding $5,000 in value in a one-year period.

317.     Through Defendants' illegal and tortious acts as herein set forth, Plaintiffs have been denied valuable business opportunities, and they have and will continue to suffer damage to their business and property and lose further opportunities.

318.     Plaintiff has also suffered irreparable damage to their business reputation and goodwill.

319.     As a direct result of Defendants' actions, Plaintiff has been damaged in an amount to be determined at trial, but believed to be not less than $100 million.

## COUNT XII
## VIOLATIONS OF THE ECPA – 18 U.S.C. § 2511(1)(a)

320.     The preceding allegations are realleged as if fully set forth here.

321.      This Count is against all Defendants.

322.     Around April of 2015, the Defendants wrongfully hacked into Plaintiff's computer(s) without authorization and intentionally endeavored to intercept, and actually did intercept, wire and electronic communications containing email address contacts ("Email List") for approximately 300 persons with whom Plaintiff was conducting business.

323.     On April 27, 2015, the Defendants then e-mailed the approximately 300 individuals on the Email List a link for a website that, as explained above, Frydman and other Defendants created - which contained untrue, disparaging and libelous information - all in furtherance of the Enterprise's scheme to defraud and pattern of racketeering.

324.     Through that email, the Defendants encouraged the individuals on the Email List not to transact business with Plaintiff.

325.     In so doing, the Defendants acted knowingly, intentionally, purposefully and maliciously. The actions constitute "interceptions" as in each instance they were an acquisition of the contents of a wire or electronic communication through the use of any electronic, mechanical or other device as defined at 18 U.S.C. § 2510(4).

326.     Through Defendants' illegal and tortious acts as herein set forth, Plaintiff has been denied valuable business opportunities, and they have and will continue to suffer damage to their business and property and lose further opportunities.

327.     Plaintiff has also suffered irreparable damage to their business reputation and goodwill.

328.    Defendants are liable, jointly and severally, to Plaintiff for the actual damages they suffered, and for punitive damages as the interception was willful, pursuant to 18 U.S.C. § 2520. As a direct result of Defendants' actions, Plaintiff has been damaged in an amount to be determined at trial, but believed to be not less than $100 million.

## PRAYER FOR RELIEF

I.    With respect to counts III, VI, VII and XVI, entry of an order (on a preliminary and permanent basis) against Defendants and their officers, agents, servants, employees, owners and representatives, and all other persons, or entities in concert or participation with them, be enjoined and restrained from:

a.    Using in any manner the Verschleiser name and likeness, or any Multi Groups name, mark or internet domain name that incorporates Verschleiser's or Multi Groups 's name or mark which is confusingly similar to or a colorable imitation of the Verschleiser or Multi Groups name or mark or any name or mark associated with Verschleiser or his businesses, including without limitation "Multi Capital", "Multi Investment",  or any name or mark which is confusingly similar to or a colorable imitation thereof;

b.    Using or displaying Verschleiser's name or likeness on any websites, domains, blogs, YouTube Videos, Internet postings or advertising, products, or promotional materials in any false and/or deceptive manner;

c.    Using in any manner any name, mark or internet domain name that incorporates "Verschleiser" or " Multi Groups "or any other name or mark which is associated with Verschleiser or his businesses, including without limitation including without

limitation "Multi Capital", "Multi Investment", or any name or mark which is confusingly similar to or a colorable imitation thereof

d.  Doing any act or thing calculated or likely to cause confusion or mistake in the minds of members of the public or prospective customers, investors or business associates of Verschleiser or any of his businesses or products or services sponsored or offered by Verschleiser or any of his businesses, as to the source of the products or services sponsored or offered by Verschleiser or his businesses for sale, distributed, or sold, or likely to deceive members of the public, or prospective customers, investors or business associates of Verschleiser or any of his businesses into believing that there is some connection between one or more of the Class A Defendants and Verschleiser;

e.  Committing any acts which will tarnish, blur, disparage or dilute, or are likely to tarnish, blur, disparage or dilute Verschleiser's name and likeness or the names or marks of Verschleiser's businesses;

f.  Making any representations that Verschleiser or his businesses have acted in any improper manner; and

g.  making or inducing others to make any disparaging or false, misleading or deceptive statement of fact, or representation of fact regarding Verschleiser or Multi Groups or any of Verschleiser's businesses, products or services;

II.   Entry of an order (on a preliminary and permanent basis) directing that the Defendants permanently remove or cause to be permanently removed:

a.  all disparaging, or false, misleading or deceptive statement of fact, or representation of fact regarding Plaintiff or Multi Groups or any of Plaintiff's businesses,

products or services in any and all postings on any website, domain, Internet post, and any other domains and websites on which they appear;

b. Defendants transfer to Plaintiff (at no cost to Verschleiser) all internet domain names that contain or consist of Plaintiff's name or the name or marks of Multi Groups or any other of Plaintiff's businesses;

c. Defendants take all steps necessary to cancel any state or local business registrations, including corporate name registrations and dba filings, that include Plaintiff's name or the name or marks of Multi Groups or any other of Plaintiff's businesses, and to remove any references to any business registrations, including corporate names and dba filings, that include Plaintiff's name or the name or marks of Multi Groups or any other of Plaintiff's businesses;

d. Defendants retain and disclose all communications with all individuals and entities with whom they engaged in any transaction relating to or arising from the use of Plaintiff's name, likeness or the name or marks of Multi Groups or any other of Plaintiff's businesses, or otherwise in furtherance of the scheme alleged herein;

e. Defendants file with this Court and serve upon Plaintiff within thirty (30) days after entry of an injunction a written report under oath describing in detail the manner and form in which the Defendants have complied with an injunction; and

f. Defendants correct any erroneous impression persons may have derived concerning Plaintiff and his businesses, including without limitation, delivering a letter to Plaintiff addressed "to whom it may concern" informing the reader thereof of the prior misrepresentations regarding Plaintiff and his businesses

61

which were created or included in any publication, website, domain, Internet posting, and clearly identifying same as false misrepresentations made intentionally to harm Plaintiff and his businesses, and retracting same.

III.   With respect to count I, ordering the Defendants to pay a judgment, jointly and severally, in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $100 million, and that such damages be trebled to $100 million, and that Plaintiff be awarded costs, attorneys' fees and expenses;

IV.   With respect to count II, ordering the Defendants to pay a judgment, jointly and severally, in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $100 million, and that Plaintiff be awarded costs, attorneys' fees and expenses;

V.   With respect to count IV, ordering the Defendants be adjudged to have violated the Federal Lanham Act and ordering the Defendants to pay a judgment, jointly and severally, in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $100 million, and that such damages be trebled to $100 million, and that Plaintiff be awarded costs, attorneys' fees and expenses;

VI.   With respect to count V, ordering that the Defendants be adjudged to have committed fraud and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $100 million, and that Plaintiff be awarded costs, attorneys' fees and expenses;

VII.   With respect to Count VI, that the Defendants be adjudged to have published Injurious Falsehoods and ordering Defendants to pay a judgment, jointly and severally, in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $100 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

VIII.  With respect to Count VII, that the Defendants be adjudged to have Interfered with Plaintiff's Prospective Business and Contractual Relations and ordering Defendants to pay a judgment, jointly and severally, in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $100 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

IX.    With respect to Count VIII, that the Defendants be adjudged to have Intentionally Inflicted Emotional Distress on Plaintiff and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $100 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

X.     With respect to Count IX, that the Defendants be adjudged to have committed Prima Facie Torts and ordering the Defendants to pay a judgment, jointly and severally, in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $100 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

XI.    With respect to Count IX, that the Defendants be adjudged to have committed Prima Facie Torts and ordering the Defendants to pay a judgment, jointly and severally, in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $100 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

XII.   With respect to Count X, that the Defendants be adjudged to have committed Violations of the CFAA and ordering the Defendants to pay a judgment, jointly and severally, in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $100 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

XIII.  With respect to Count XI, that the Defendants be adjudged to have conspired to violate the CFAA, and ordering the Defendants to pay a judgment, jointly and severally, in the

amount of Plaintiff's actual damages as determined at trial believed to be not less than $100 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

XIV.  With respect to Count XII, that the Defendants be adjudged to have committed Violations of the ECPA, and ordering the Defendants to pay a judgment, jointly and severally, in the amount of: (i) Plaintiff's actual damages as determined at trial, but believed to be not less than $100 million, (ii) Plaintiff's punitive damages to be determined at trial, and (iii) Plaintiff's costs, attorneys' fees and expenses;

XV.  That Plaintiff be granted punitive damages as appropriate, prejudgment and post judgment interest; costs associated with the prosecution of this action; and such further relief as the Court may deem just.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a jury trial with respect to all claims for relief in this Complaint triable before a jury as a matter of right.

Dated:      New York, New York
   January 21, 2021

_____
Eli Verschleiser, *Pro Se*

# EXHIBIT A

## Jacob Frydman Lawsuits Partial List

| | Lawsuit Caption / Title |
|---|---|
| 1 | Bankruptcy Petition Deluxe Building Solutions, LLC 5:21-bk-00534-HWV |
| 2 | Grozinsky, David Kennan V. Kenwood Commons Llc 650950-2020E |
| 3 | Columbia Petroleum Transportation, Llc, Dba John Ray & Sons Vs. Kenwood Commons, Llc |
| 4 | Jfurti, Llc Et Al V. Downey Brand Llp Et Al |
| 5 | Niagara Mohawk Power Corporation D/B/A National Grid Vs. Kenwood Commons, Llc |
| 6 | Tbg Funding Llc V Kenwood Commons Llc, Jacob Frydman, Jacob Frydman 2000 Irrevocable Trust, Etc |
| 7 | Arbor-Myrtle Beach Pe Llc V. Frydman, Jacob |
| 8 | Jfurti, Llc Et Al V. Downey Brand Llp Et Al |
| 9 | United Realty Advisors, Lp V. Herrick Feinstein Llp |
| 10 | Verschleiser, Eli V. Frydman, Jacob |
| 11 | Winter Investors, Llc Et Al V. Eli Verschleiser Et Al |
| 12 | Rosalind Davidowitz - V. - First Capital Real Estate Advisors L.P |
| 13 | Davidowitz, Rosalind V. First Capital Real Estate |
| 14 | Frydman, Jacob V. Evunp Holdings |
| 15 | Frydman, Jacob V. Verschleiser, Eli |
| 16 | Eli Verschleiser V Jacob Frydman, Jfurti, Llc, Summer |
| 17 | Frydman V. Experian Information Solutions |
| 18 | Jfurti, Llc Et Al V. Downey Brand Llp |
| 19 | Jfurti, Llc Et Al V. Singal Et Al |
| 20 | Rhineback, Bank Against Wa 319 Main Llc, Jacob Frydman, Et Al |
| 21 | Verschleiser, Eli V. Frydman, Jacob |
| 22 | 8430985 Canada, Inc. V. Jacob Frydman Et Al |
| 23 | Jacob Frydman V David O. Wright, Abraham George, Et Al |
| 24 | Jfurti, Llc And Jacob Frydman, V Suneet Singal; Forum Partners |
| 25 | Jfurti, Llc Et Al V. Forum Partners Investment Management, Llc Et Al |
| 26 | Ledgerock, Llc V. Shoreline Pools, Inc. |
| 27 | Wells Fargo Financial Leasing, Inc. V First Capital Real Estate Advisors, Lp A/K/A United Realty Advisors, L.P., Jacob Frydman |
| 28 | Wells Fargo Financial Leasing, Inc.  V United Realty Advisors, L.P. Et Al |
| 29 | 8430985 Canada, Inc. V. Jfurti Llc |
| 30 | Frydman, Jacob V. Wright, David O. |
| 31 | Goldman, Sachs & Co. V. 8430985 Canada Inc. |
| 32 | Jfurti, Llc V. Singal, Suneet |
| 33 | Wells Fargo Financial Leasing, Inc. - V. - United Realty Advisors, L.P. Et Al |
| 34 | Wells Fargo Financial V. United Realty Advisors, L.P. |
| 35 | Albert Akerman V Jacob Frydman |
| 36 | Jacob Frydman V Alexander Francese |
| 37 | Albert Akerman - V. - Jacob Frydman Et Al |
| 38 | Frydman, Jacob V. Francese, Alexander |
| 39 | 8430985 Canada, Inc. V. United Realty Advisors, L.P., Frydman And Verschleiser, 653564-2014 (Ny Sup. Ct. Ny Co) |
| 40 | Coca-Cola Refreshments Usa, Inc., F/K/A Coca-Cola Enterprises, Inc. Vs. Bull & Buddha, Llc, Frydman, Monica |
| 41 | Diamond V. Frydman, 14 Cv 8742 (Sdny Nov. 3, 2014) |
| 42 | Empire Merchants North Llc V. Bull & Buddha Llc Et Al (Ny Sup. Ct. Monroe Co. Index No. 5498-2014) |
| 43 | Evunp V. Frydman, 650841/2014 (Sup. Ct. N.Y. County Mar. 14, 2014) |
| 44 | Frydman V. Diamond Et Al |
| 45 | Frydman V. Equifax, No. 14-Cv-9015, Ecf No. 1 (S.D.N.Y. Nov. 12, 2014) |
| 46 | Frydman V. Experian, No. 14-Cv-9013, Ecf No. 1 (S.D.N.Y. Nov. 12, 2014); |
| 47 | Frydman V. Rosen, No. 159833/2014, Ecf No. 1 (Sup. Ct. N.Y. County Oct. 7, 2014) |
| 48 | Frydman V. Transunion Risk And Alternative Data Solutions, Inc. |
| 49 | Frydman V. Transunion Risk, No. 14-Cv-9016, Ecf No. 1 (S.D.N.Y. Nov. 12, 2014) |
| 50 | Frydman V. Verschleiser,14-Cv-8084 (S.D.N.Y Oct. 7, 2014) |
| 51 | Jfurti V. Verschleiser, No. 650803/2014 (Sup. Ct. N.Y. County Mar. 12, 2014) |
| 52 | Ny State Dep'T Of Taxation And Finance V. Savoy Senior Housing Corporation, (Judgments And Liens 03-1-14) |
| 53 | Parker Note Acquisition, Llc V. 70 Parker Avenue Properties Et Al (Ny Sup. Ct. Ny Co. Index No. 652405-2014) |
| 54 | United Realty V. Verschleiser, No. 14-Cv-5903, Ecf No. 1 (S.D.N.Y Jul. 30, 2014) |
| 55 | Wa Route 9, Llc V. Paf Capital Llc, (Ny Sup. Ct. New York Co. Index No. 651688- 2012) |
| 56 | Warren Diamond V. Jacob Frydman (Ny Sup. Ct. Ny Co. Index No. 653332- 2014) |
| 57 | Winter Investors, Llc V. Panzer, No. 14-Cv-6852 (S.D.N.Y. Aug. 22, 2014) |

| 58 | Apf Fire Protection V. Ledgerock Llc, Dutchess Co. 6641-2013 |
| 59 | Atlantic Concrete Foundation Inc. V. White Acre Equities Llc., (N.Y. Sup. Ct. Ulster Co. Index No. 1406-2013) |
| 60 | Djzv Holdings Llc V. Jacob Frydman, No. 654346/2013 (Sup. Ct. N.Y. County) |
| 61 | Hudson Commercial Real Estate V. Parker Avenue Note Acquisition (Ny Sup. Ct. Dutchess Co. Index No. 0391-2013) |
| 62 | Ledgerock Llc V. Apf Fire Protection, Inc., Dutchess Co. 1261-2013 |
| 63 | Jack Guttman V. Warren Diamond Et Al (Ny Sup. Ct. Ny Co. Index No. 650592- 2010) |
| 64 | Jacob Frydman V. David Lichtenstein (Ny Sup. Ct. New York Co. Index No. 590603-2012) |
| 65 | Kiphart Richard P V. Frydman, Jacob, 2012-L-010840 (Iii. Cir. Ct. Sept. 24, 2012) |
| 66 | Paf Capital Llc V. Jacob Frydman Et Al (Ny Sup Ct. New York Co. Index No. 590475- 2012) |
| 67 | Parker Note Acquisition Llc V. Parker Avenue Associates Et Al (Ny Sup. Ct. Dutchess Co. Index No. 3020-2012) |
| 68 | Peckar & Abramson, Pc V. White Acre Equities, Llc (Ny Sup. Ct. Ny Co. Index No. 152560-2012) |
| 69 | Scott Diamond V. Tunnel Associates And Jacob Frydman (Ny Sup. Ct. Ny Co. Index No. 156620-2012) |
| 70 | Andrew Sutton V. Lambdastar Infrastructure Partners Llc Et Al. (Ny Sup. Ct. Ny Co.Index No. 653453-2011) |
| 71 | Anthony Clouden  V  Jcs Realty Llc, Jacob Frydman Et Al Ct. Kings Index No. 105314 / 2011 |
| 72 | Capital One, N.A. V. Frydman 11-Cv-02231 (S.D.N.Y. Mar. 31, 2011) |
| 73 | Capital One, N.A. V. Surrey Equities, (Frydman) 11-Cv-01798 (S.D.N.Y. Mar. 15, 2011) |
| 74 | Capital One, N.A. V. White Acre Equities, Llc 11-Cv-02233 Sdny March 31, 2011 |
| 75 | Ganfer & Shore V Frydman (Aaa Case No. 13194174011) |
| 76 | Ledgerock, Llc V. Advanced Radiant Design, Inc., (Sup. Ct. Dutchess Co. Index No. 11649/2010) |
| 77 | Ledgerock, Llc V. American Architectural, Inc., (Ny Sup. Ct. Dutchess Co. Index No. 7979/2010) |
| 78 | Ny State Dep'T Of Taxation And Finance V. Frydman & Company, Docket No. 2788650 (Judgments And Liens Feb. 05, 2011) |
| 79 | Parker Avenue Associates V. 70 Parker Avenue Et Al (Ny Sup. Ct. Dutchess Co. Index No. 6519-2011) |
| 80 | Paulus Sokolowski And Sartonengineering V. Savoy Senior Housing Corp, Docket No. 2797177 (Judgments And Liens) |
| 81 | Surrey Equities, Llc Et Al V. Capital One, N.A., Docket No. 1:11-Cv-02247 (S.D.N.Y. Apr 01, 2011) |
| 82 | Vineyard Avenue Electric V. Ledgerock Llc, Dutchess Co. 3297-2011 |
| 83 | Vineyard Avenue Electric V. Ledgerock, Llc., Dutchess Co. 3493-2011 |
| 84 | White Acre Equities, Llc V. Doors In Motion (Ny Sup. Ct. Ny Co. Index No. 652155-2011 |
| 85 | Andrew Sutton V. Lambdastar, Jacob Frydman, Et Al Arbitration (Aaa) Case No. 13 116 0303110 |
| 86 | Bank Of America, N.A. V. J.C.S. Realty, Llc, 30596/2010 |
| 87 | Barnes & Thornburg Llp V. Jacob A. Frydman, 108532/2010 |
| 88 | Golden & Golden Building V. Ledgerock Extension, Llc (Ny Sup. Ct. Dutchess Co.Index No. 7496-2010) |
| 89 | Jc Studios Brooklyn Ii, Llc And Jacob Frydman V. Chase Home Finance Llc, (Ny Sup.Ct. Index No. 115626/2010) |
| 90 | Sunmark Fcu V. Cw Montgomery Et Al (Ny Sup. Ct. Albany Co. Index No. 2218-2010) (Foreclosure On Property) |
| 91 | Travelers Indemnity V Jacob Frydman And White Acre Equities, Llc, (Ny Sup. Ct. Onondaga Co. Index No. 2010-2802) |
| 92 | Wa Route 9, Llc V. Fuss & O'Neill Consulting (Ny Sup Ct. Ny Co. Index No. 101180- 2010) |
| 93 | White Acre Equities, Llc V. Doors In Motion (Ny Sup. Ct. Ny Co. Index No. 115507- 2010) |
| 94 | Cuddy & Feder Llp V. White Acre Equities, Llc (Ny Sup. Ct. Westch. Co. Index No. 15438-2009) |
| 95 | Cw Montgomery Street Partners, Llc, & Anthony J. Audi, Jr. V. Wa 143 Montgomery Llc & Jacob Frydman |
| 96 | Gemstone Builders, Inc. V. Jeff Stutz, Docket No. A141847 (Or. Ct. App. Apr. 10, 2009), Court Docket (04/10/2009) |
| 97 | Monica Libin Frydman V. Great Northern Ins. Co. (Ny Sup. Ct. Ny Co. 103235-2009) |
| 98 | Peckar & Abramson, P.C. V. Lyford Holdings, Ltd., Docket No. 100005/2009 (N.Y. Sup Ct. Jan. 02, 2009), |
| 99 | Saccardi & Schiff, Inc. V. White Acre Equities, Llc (Ny Sup. Ct. Westch. Co. Index No. 20374-2009) |
| 100 | Savoy Senior Housing Corp. V. Trbc Ministries, Llc, 401 B.R. 589, 597 (S.D.N.Y. 2009) |
| 101 | Savoy Senior Housing Et Al V. Mt. Hawley Insurance, Docket No. 1:09-Cv-03535 (S.D.N.Y.), Court Docket (04/07/2009) |
| 102 | Sokolowski, Paulus V. Savoy Senior Housing, Docket No. 600085/2009 (N.Y. Sup Ct. Jan. 13, 2009), Court Docket (01/13/2009) |
| 103 | State Of Ohio Dept Of Taxation Vs. Wizard Group Inc Dba Wizard Of Za Gourmet Pizza, Docket No. Jl-09-398286 |
| 104 | Stracher Roth Gilmore Architects V. White Acre Equities, Llc (Ny Sup. Ct. Schenectady Co. Index No. 2816-2009) |
| 105 | White Acre Equities, Llc V. Fuss And O'Neill Of New York (Nyc Civ. Ct. Ts-300667/09) |
| 106 | White Acre Equities, Llc V. Matovu Foundation, Inc. (Ny Sup. Ct. Ny Co. Index No. 111818-2009) |
| 107 | Jc Studios Brooklyn Iii, Llc V. Car-Go Center, Inc. (Ny Sup. Ct. Kings Co. Index No.974-2008) |
| 108 | Kemper Insurance Companies, V Frydman Jacob |
| 109 | Landy, Karen Ano V. Lombardozzi, Joanna Etal, Docket No. 29995/2008 (N.Y. Sup Ct. Nov. 17, 2008) |
| 110 | Landy, Karen Ano V. Lombardozzi, Joanna Etal, Docket No. 700075/2008 (N.Y. Sup Ct. Nov. 17, 2008), |
| 111 | Ny State Dep'T Of Taxation And Finance V. Frydman & Company, Docket No. 2406019 (Judgments And Liens) |
| 112 | Paulus Sokolowski V. White Acre Equities (Ny Sup. Ct. Ny Co. Index No. 602807-2008) |
| 113 | Plazamill Limited Partnership And Surrey Sawmill Acquisition, Llc V. Franklin County Board Of Revision Et Al, |
| 114 | Savoy Senior Housing Corp (Frydman) V. Trbc Ministries, Llc., 1:08-Cv-08874 (S.D.N.Y. Oct 16, 2008) |
| 115 | Savoy Senior Housing Corp Et Al V. Trbc Ministries, L.L.C,  (N.Y. Sup Ct. Sept. 18, 2008), |
| 116 | Savoy Senior Housing V. Westermann, Rose Ano, 5 (N.Y. Sup Ct. Mar. 07, 2008), Court Docket (03/07/2008) |
| 117 | Sleppin, Stu Ano V. Lombardozzi, Joanna Etal,  (N.Y. Sup Ct. Aug. 04, 2008), Court Docket (08/04/2008) |

| | |
|---|---|
| 118 | The State Of Texas Vs Gemstone Builders, Inc, A Texas Corporation, Et Al  (Tex. County Ct. Aug. 14, 2008) |
| 119 | White Acre Equities, Llc V. Fuss (Ny Sup. Ct. Ny Co. Index No. 113565-2008) |
| 120 | White Acre Equities, Llc V. Maximiliaan'S House (Ny Sup. Ct. Ny Co. Index No. 602222-2008) |
| 121 | Ny State Dep'T Of Taxation And Finance V. Frydman & Company, Docket No. 2406019 (Judgments And Liens Mar. 29, 2008), |
| 122 | 700 North Delaware, Llc (Frydman) V. Weinstein, 07-Cv-02252 (E.D. Pa. Jun 04, 2007) |
| 123 | Savoy Management V. Leview Fulton Club, Llc, (N.Y. Sup Ct. May 04, 2007), Court Docket (05/04/2007) |
| 124 | White Acre Equities, Llc V. Casa Collection, Inc. (Ny Sup. Ct. Ny Co. Index No. 602996-2007) |
| 125 | Fralin Feinman Coates & Kinnier Pc Vs. Frydman, Jacob |
| 126 | Savoy Management Corporation V. Leviev Fulton Club Llc, (N.Y. Sup Ct. June 05, 2006), |
| 127 | United States Of America V. Savoy Senior Housing Corporation Et Al |
| 128 | United States Of America V. Savoy Senior Housing Corporation Et Al, Docket No. 6:06-Cv-00031 (W.D. Va. Jul 26, 2006), |
| 129 | White Acres Equities, Llc V. Town Of Rhinebeck (Ny Sup. Ct. Dutchess Co. Index No.1994-2006) |
| 130 | Savoy Management Corporation V. Leviev Fulton Club Llc, Docket No. 107734/2006 (N.Y. Sup Ct. June 05, 2006), |
| 131 | 84 Lumber Company, L.P. Vs Gemstone Builders, Inc., And Bob Hutchins, Docket No. 05-04-03825 (Tex. Dist. Ct. Apr. 28, 2005) |
| 132 | General Electric Capital V. Frydman And Company, (N.Y. Sup Ct. Jan. 18, 2005), Court Docket (01/18/2005) |
| 133 | Jc Studios Brooklyn, Llc V. Lillo Brothers, Llc (Ny Sup. Ct. Kings Co. Index No. 23737-2005) |
| 134 | Net Connections Web Inc  V  Savoy Senior Housing Corporation, Index No.-31958/05 |
| 135 | Savoy Management V. 151 William Realty Llc, Docket No. 601495/2005 (N.Y. Sup Ct. Apr. 26, 2005), Court Docket (04/26/2005) |
| 136 | Corem Capital Partners Llc V, Tunnel Associates, Llc (Ny Sup. Ct. Ny Co. Index No. 601350-2004) |
| 137 | De Lage Landen Financial Svcs V. Frydman & Company, Docket No. 604402/2004 (N.Y. Sup Ct. Dec. 30, 2004), |
| 138 | Liberty Village Associates L P V. Community National Bank, Docket No. 600343/2004 (N.Y. Sup Ct. Feb. 10, 2004), |
| 139 | Liberty Village Associates Limited Partnership |
| 140 | Liberty Village Associates Limited Partnership, And Community National Bank |
| 141 | Masco Contractor Services Central Inc V. Gemstone Builders Inc, Docket No. 42-2004-Cc-000326-Axxx-Xx (Fla. County Ct. Apr. 20, 2004) |
| 142 | Monica Frydman V Harriet M. Young And Raymond Et Al (Ny Sup. Ct. Dutchess Co. Index No. 5827-2004 |
| 143 | Peckar & Abramson, Pc V. Savoy Little Neck Associates, Lp Et Al (Ny Sup. Ct. Ny Co. Index No. 105261-2004) |
| 144 | Telco Associates, Member & On Behalf Of 636 Eleventh V White Acre Capital (Ny Sup. Ct. Ny Co. Index No. 601349-2004) |
| 145 | Tunnel Associates, Llc V. Diamond (Ny Sup. Ct. Ny Co. Index No. 109815-2004) |
| 146 | Wells Fargo Bank Minnesota National Association Et Al -V- J.C. Studios, L.L.C |
| 147 | White Acre Capital V. Telco Associates, Llc (Sup. Ct. Ny Co. Index No. 109814-2004) |
| 148 | Wilbert,Montenegro & Thompson V. Savoy Sr. Housing Corp., Docket No. 7376/2004 (N.Y. Sup Ct. Mar. 05, 2004) |
| 149 | Best G C Inc Vs. Liberty Village Associates Lp, Docket No. Ch03000200-00 (Va. Cir. Ct. July 11, 2003), |
| 150 | Carpetland Usa Of Lynchburg Vs. Liberty Village Associates, Docket No. Ch03000231-00 (Va. Cir. Ct. July 31, 2003), |
| 151 | Carpetland Usa Of Lynchburg Vs. Liberty Village Association, Docket No. Ch03000226-00 (Va. Cir. Ct. July 31, 2003) |
| 152 | Carpetland Usa Of Lynchburg Vs. Liberty Village, Docket No. Ch03000222-00 (Va. Cir. Ct. July 31, 2003), |
| 153 | Comm Of State Ins Fund V. Savoy Senior Housing Corp, Docket No. 401458/2003 (N.Y. Sup Ct. May 02, 2003), |
| 154 | Dawson Construction Company V. Liberty Village Associates, Docket No. Ch03000287-00 (Va. Cir. Ct. Sept. 23, 2003), |
| 155 | Dicarlo Distributors, Inc. V  Savoy Boro Park Associates, Lp |
| 156 | Doral Money Inc. V. Savoy At Staten Island Lp., 602854/2003 (N.Y. Sup. Ct. Sept. 10, 2003) |
| 157 | Heath Debra V. Gemstone Builders Inc, Docket No. 42-2003-Sc-001299-Axxx-Xx (Fla. County Ct. Apr. 10, 2003), |
| 158 | Home Design Services V. Lake Diamond Assoc, Et Al, Docket No. 5:03-Cv-00347 (M.D. Fla. Oct 07, 2003), Court Docket (10/07/2003) |
| 159 | Hurt & Proffitt Inc Vs. Liberty Village Associates, Docket No. Ch03000255-00 (Va. Cir. Ct. Aug. 27, 2003), Court Docket (08/27/2003) |
| 160 | Kaye Insurance V. Savoy Senior Housing, Docket No. 15860/2002 (N.Y. Sup Ct. Feb. 27, 2003), Court Docket (02/27/2003) |
| 161 | Leisure Publishing Company Inc Vs. Savoy Senior Housing Corp, Docket No. Cl03000695-00 (Va. Cir. Ct. June 13, 2003) |
| 162 | Marvin V Templeton & Sons Inc Vs. Liberty Village Associates, Docket No. Ch03000207-00 (Va. Cir. Ct. July 17, 2003), |
| 163 | Oglesby Drywall Corporation V. Gemstone Builders Inc, Docket No. 42-2003-Cc-000968-Axxxxx (Fla. County Ct. Sept. 16, 2003) |
| 164 | Premins Co. Inc. V. Liberty Village Associates, Docket No. 46109/2003 (N.Y. Sup Ct. Nov. 26, 2003), Court Docket (11/26/2003) |
| 165 | The Vac Stop Inc V. Gemstone Builders Inc, Docket No. 42-2003-Sc-002781-Axxx-Xx (Fla. County Ct. July 16, 2003), |
| 166 | Colin Service Systems,Inc., V. Savoy Senior Housing, Docket No. 9844/2001 (N.Y. Sup Ct. July 24, 2002), Court Docket (07/24/2002) |
| 167 | Savoy Senior Housing V. Cooper & Cook Ins., Et Al, Docket No. 1:02-Cv-03173 (S.D.N.Y. Apr 24, 2002), Court Docket (04/24/2002) |
| 168 | Frydman And Co. V. Aaa Auto Carriers Docket No. 603924/2001 (Ny Sup Ct. Aug. 2001) |
| 169 | Rodriguez,Thelma V. Savoy Boro Park Associates, Docket No. 37243/2001 (N.Y. Sup. Ct. Oct. 09, 2001), Court Docket (10/09/2001) |
| 170 | Savoy Senior Housing V. Cooper & Cook, Et Al, Docket No. 1:01-Cv-05461 (S.D.N.Y. Jun 18, 2001), Court Docket (06/18/2001) |
| 171 | Winfield Security Corp. V. Savoy Senior Housing Corp., Docket No. 602693/2001 (N.Y. Sup Ct. May 30, 2001), |
| 172 | Zudick,Alice V. City, Docket No. 26129/2001 (N.Y. Sup Ct. July 17, 2001), Court Docket (07/17/2001) |
| 173 | Frydman & Company V. Corbett Towing, Docket No. 124043/2000 (N.Y. Sup Ct. Nov. 29, 2000), Court Docket (11/29/2000) |
| 174 | Mossack D.D.S.P.C. Robert D. Vs. Jacob Frydman Jarred Frydman, Jaime Frydman, Joshua Frydman, Elyse |
| 175 | Frydman And Co. V. Credit Suisse First Boston, Docket No. 605549/1998 (N.Y. Sup. Ct. Nov. 1998) |
| 176 | North Shore Day Camp Inc. V Frydman Jacob |
| 177 | Stephen J. Fein V Jacob A. Frydman, Small Claims Court 2089/98 |

| | |
|---|---|
| 178 | Bdo Seidman, Llp V. Frydman & Co., Index No. 603077/1998 (Ny Sup.Ct. June 1997) |
| 179 | Gemstone Builders Inc, Docket No. 4:97-Bk-03561 (Bankr. D. Ariz. Aug 15, 1997), Court Docket (08/15/1997) |
| 180 | Johnson, J. Arthur V. Milstein, Paul, Docket No. 120975/1997 (N.Y. Sup Ct. Nov. 10, 1997), Court Docket (11/10/1997) |
| 181 | Ledgerock, L.L.C., Docket No. 1:97-Bk-10829 (Bankr. W.D. Tex. Mar 04, 1997), Court Docket (03/04/1997) |
| 182 | Starrett Acquisition V. Starrett Corporation, Docket No. 605392/1997 (N.Y. Sup Ct. Oct. 22, 1997), Court Docket (10/22/1997) |
| 183 | Sunny Isle Dvlmt, Corp. V. Frydman, Jacob, (Ny Sup. Ct. Ny Co. Index No.602854/1997) |
| 184 | Steinberg And Frydman Beck King & Arad |
| 185 | Antares Group Inc  V Dba Royce Security Services Vs. Frydman, Jacob |
| 186 | Brenner, Et Al V. Siegel, Et Al |
| 187 | Cellular One Vs. Frydman |
| 188 | Lo-Temp, Inc. V. Jacob Frydman, D/B/A Jacob Frydman Tv Enterprises Index No.26386/95 |
| 189 | Ohio Bar Association Vs. Frydman, Jacob |
| 190 | Elyse Frydman V Jacob Frydman (Ny Ct. Nassau Co. Index # 29904-1994)( Post-Litigation 2002 - 2005) |
| 191 | Ewc Retirement Plan And Pillen |
| 192 | Federal Savings V. Frydman, 9:94-Mc-00011 (E.D.N.Y. Jan 25, 1994) |
| 193 | Frydman V. Sarasota, Inc. |
| 194 | Fouss, Et Al V. Talmadge, Et Al |
| 195 | Kenneth Sustin V. Jacob A. Frydman |
| 196 | 1001 Huron Road Associates |
| 197 | Cage Holdings, Co. |
| 198 | Coviello, Et Al V. Mid-America Fed Svgs, Et Al |
| 199 | Pillin'S Place, Inc., Et Al V. Bank One, Akron, Na, Et Al |
| 200 | Central States, Et Al V. Joseph Feldman, Et Al., 1:90-Cv-01290 (N.D. Iii. Mar. 06, 1990) |
| 201 | River St Sta Assoc V. Wolstein, Et Al |
| 202 | Lustig Group, Inc. Et Al V. Bank Of New England, N.A. Et Al |
| 203 | Miami Elevator Co Vs. Kress Associates Ltd, Docket No. 1989-012252-Cc-05 (Fla. Cir. Ct. Jul. 12, 1989), |
| 204 | Miami Elevator Co Vs. Kress Associates Ltd, Docket No. 1989-022987-Sp-05 (Fla. Cir. Ct. Dec. 19, 1989) |
| 205 | Deossie, Et Al V. Lustig Pro Sports, Et Al |
| 206 | Rosenman & Colin, Llp V. Jacob A. Frydman, Index No. 604674/1998 (Ny Sup. Ct. Sept 1998) |
| 207 | Station Plaza Associates Et Al V. Bank Of New England, N.A. |
| 208 | Willis Trevor V. Pier House Motel Inc., 1988-042078-Ca-01 (Fla. Cir. Ct. Oct. 05, 1988) |
| 209 | Philips Credit Co V. Jacob Frydman, 1987-042915-Ca-01 (Fla. Cir. Ct. Oct. 01, 1987) |
| 210 | Sheldon Feldman V. Jacob A. Frydman, Docket No. 1986-1407 (Oh. Sup. Ct. Aug. 1986) |
| 211 | Eisenberg, Beatrice Vs. South Fla Motels Inc, Docket No. 1977-022325-Ca-01 (Fla. Cir. Ct. Sep. 08, 1977), |
| 215 | Jacob A. Frydman V Sarasota, Inc. Usdc Sdny 94 Cv 2884 |
| 216 | John White V. White Acres Equities, Llc (Poughkeepsie City Ct. Cv-10-3782) |
| 217 | Nyc Department Of Finance V. Lambdastar Infrastructure Partners Llc, Docket No. 2619560 |
| 218 | Nys Department Of Taxation And Finance V. Lambdastar Infrastructure Partners Llc, Docket No. 3124659 |
| 219 | Ohio Savings Bank V Cuyahoga River Associates Lp, Jacob Frydman Et Al, (Case # 163983 Cuyahoga County, Oh) |
| 220 | The Alexander Condominium Association, Inc., V Sherlock Partners, Miami Dade # 09-84503 |
| 221 | Wells Fargo Bank V. Jc Studios Llc, Jacob A. Frydman Et Al, Usdc Sdny 04 Cv 0983 |

**EXHIBIT B**



PO Box 1191
Poughkeepsie, NY 12602



| | |
|---|---|
| Account Number | |
| Statement Date | 03/31/2016 |
| Statement Thru Date | 03/31/2016 |
| Checks/Items Enclosed | 0 |
| Page | 1 |

**Return Service Requested**

00004817 MRSR8900160 01 000000000 08
Jacob Frydman 2000 Irrevocable Trust
Jacob A Frydman Trustee
46 Ledgerock Lane
Hyde Park NY 12538

## Customer Service Information

**Customer Solutions Center**
**845-454-8555, option 3**

**Visit Us Online:**
**www.rhinebeckbank.com**

## RELATIONSHIP SUMMARY

| Account Type | Account Number | Interest Paid In 2015 | Balance |
|---|---|---|---|
| SMALL BUSINESS CHECKING | | $0.00 | $10.51 |

### SMALL BUSINESS CHECKING

**Account Number:**

**Account Owner(s):** Jacob Frydman 2000 Irrevocable Trust
Jacob A Frydman Trustee

### Balance Summary

| | |
|---|---|
| Beginning Balance as of 03/01/2016 | $10.51 |
| + Deposits and Credits (0) | $0.00 |
| - Withdrawals and Debits (0) | $0.00 |
| Ending Balance as of 03/31/2016 | $10.51 |
| Service Fees for Period | $0.00 |





PO Box 1191
Poughkeepsie, NY 12602



**Return Service Requested**

00004818 MRSR8900160 01 000000000 08
Monica Libin 2000 Irrevocable Trust
Jacob A Frydman Trustee
46 Ledgerock Lane
Hyde Park NY 12538

Account Number
Statement Date                   03/31/2016
Statement Thru Date              03/31/2016
Checks/Items Enclosed                    0
Page                                     1

## Customer Service Information

**Customer Solutions Center**
**845-454-8555, option 3**

**Visit Us Online:**
**www.rhinebeckbank.com**

## RELATIONSHIP SUMMARY

| Account Type | Account Number | Interest Paid In 2015 | Balance |
|---|---|---|---|
| SMALL BUSINESS CHECKING | ▮▮▮▮▮▮▮ | $0.00 | $190.90 |

## SMALL BUSINESS CHECKING

**Account Number:** ▮▮▮▮▮▮▮

**Account Owner(s):**   Monica Libin 2000 Irrevocable Trust
Jacob A Frydman Trustee

### Balance Summary

| | |
|---|---|
| Beginning Balance as of 03/01/2016 | $190.90 |
| + Deposits and Credits  (0) | $0.00 |
| - Withdrawals and Debits  (0) | $0.00 |
| Ending Balance as of 03/31/2016 | $190.90 |
| Service Fees for Period | $0.00 |



Statement Period
From June        01, 2015
To   June        30, 2015
Page    2 of      2

PRIVATE CLIENT GROUP 242
261 MADISON AVENUE
NEW YORK, NY 10016

JACOB FRYDMAN 2000 IRREVOCABLE TRUST     8-242
JACOB A FRYDMAN TRUSTEE
POB 2008
HYDE PARK NY  12538

See Back for Important Information

Primary Account: ███████████

MONOGRAM INSURED MMA        ████████████

Summary

Previous Balance as of June     01, 2015                                          13.11

There was no deposit activity during this statement period

Ending Balance as of   June     30, 2015                                          13.11

```
*========================================= Interest Summary ===============================================*
*  Year-To-Date Interest              .00                                                                 *
*  Interest Paid This Period          .00     Annual Percentage Yield Earned    0.00 %                    *
*  Avg. Balance this Period         13.11     Days in Period                    30                        *
*=========================================================================================================*
```

**Signature Bank doc: 2093**

Statement Period
From July     01, 2015
To   July     31, 2015
Page    1 of    2

PRIVATE CLIENT GROUP 242
261 MADISON AVENUE
NEW YORK, NY 10016

JACOB FRYDMAN 2000 IRREVOCABLE TRUST     8-242
JACOB A FRYDMAN TRUSTEE
POB 2008
HYDE PARK NY  12538

See Back for Important Information

Primary Account:

EFFECTIVE SATURDAY MAY 2ND, WE WILL BE EXPANDING
OUR SIGNATURE BANK CALL CENTER HOURS TO INCLUDE
WEEKENDS. THE CALL CENTER WILL BE OPEN ON SATURDAYS
AND SUNDAYS FROM 9:00 AM ET UNTIL 5:00 PM ET.
FOR MORE INFORMATION ABOUT SIGNATURE BANK PRODUCTS
AND SERVICES, PLEASE CONTACT YOUR PRIVATE CLIENT
BANKING TEAM, VISIT WWW.SIGNATURENY.COM, OR CALL
TOLL-FREE 1-866-SIGLINE.

Signature Relationship Summary

| | | Opening Bal. | Closing Bal. |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| MONOGRAM INSURED MMA | | 13.11 | .00 |
| RELATIONSHIP | TOTAL | | .00 |

**Signature Bank doc: 2094**

Statement Period
From July       01, 2015
To    July       31, 2015
Page      2 of       2

PRIVATE CLIENT GROUP 242
261 MADISON AVENUE
NEW YORK, NY 10016

JACOB FRYDMAN 2000 IRREVOCABLE TRUST     8-242
JACOB A FRYDMAN TRUSTEE
POB 2008
HYDE PARK NY  12538

See Back for Important Information

Primary Account:

MONOGRAM INSURED MMA

Summary

Previous Balance as of July       01, 2015                                      13.11
        1 Debits                                                                13.11
Ending Balance as of   July       31, 2015                                        .00

Withdrawals and Other Debits
Jul 16   TRANSFER DR
         TRANSFER TO:                                                           13.11

Daily Balances
Jun 30              13.11              Jul 16          .00

**Signature Bank doc: 2095**

Statement Period
From July      01, 2015
To    July      31, 2015
Page    1 of      2

PRIVATE CLIENT GROUP 242
261 MADISON AVENUE
NEW YORK, NY 10016

MONICA LIBIN 2000 IRREVOCABLE TRUST      8-242
JACOB A FRYDMAN TRUSTEE
POB 2008
HYDE PARK NY  12538

See Back for Important Information

Primary Account:

EFFECTIVE SATURDAY MAY 2ND, WE WILL BE EXPANDING
OUR SIGNATURE BANK CALL CENTER HOURS TO INCLUDE
WEEKENDS. THE CALL CENTER WILL BE OPEN ON SATURDAYS
AND SUNDAYS FROM 9:00 AM ET UNTIL 5:00 PM ET.
FOR MORE INFORMATION ABOUT SIGNATURE BANK PRODUCTS
AND SERVICES, PLEASE CONTACT YOUR PRIVATE CLIENT
BANKING TEAM, VISIT WWW.SIGNATURENY.COM, OR CALL
TOLL-FREE 1-866-SIGLINE.

| Signature Relationship Summary | | | Opening Bal. | Closing Bal. |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| | MONOGRAM INSURED MMA | | 35.07 | .00 |
| | RELATIONSHIP | TOTAL | | .00 |

**Signature Bank doc: 2293**

Statement Period
From July    01, 2015
To    July    31, 2015
Page    2 of    2

PRIVATE CLIENT GROUP 242
261 MADISON AVENUE
NEW YORK, NY 10016

MONICA LIBIN 2000 IRREVOCABLE TRUST    8-242
JACOB A FRYDMAN TRUSTEE
POB 2008
HYDE PARK NY  12538

See Back for Important Information

Primary Account: ▇▇▇▇▇▇▇▇

MONOGRAM INSURED MMA    ▇▇▇▇▇▇▇▇

Summary

Previous Balance as of July    01, 2015                                    35.07
    2 Debits                                                              35.07
Ending Balance as of   July    31, 2015                                     .00

Withdrawals and Other Debits
Jul 06   MBO INTERNAL XFER                                                 35.00
                         TO CREDIT ACCOUNT ▇▇▇▇▇▇▇▇
Jul 16   TRANSFER DR                                                        .07
         TRANSFER TO:    ▇▇▇▇▇▇▇

Daily Balances
Jun 30              35.07              Jul 16        .00
Jul 06                .07

**Signature Bank doc: 2294**

EXHIBIT C

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

**PRESENT:** _____ENGORON_____          **PART** 37
                                    _Justice_

Index Number : 154932/2016                    **INDEX NO.** 154932/2016
8430985 CANADA, INC.
vs                                            **MOTION DATE** 7/12/16
JFURTI LLC
Sequence Number : 001                         **MOTION SEQ. NO.** 001
TURNOVER

The following papers, numbered 1 to _3_ , were read on this motion to/for petition to turn over funds _____

Notice of ~~Motion/Order to Show Cause~~ petition — Affidavits — Exhibits _____ | No(s).      1

Answering Affidavits — Exhibits _____ | No(s).      2

Replying Affidavits _____ | No(s).      3

Upon the foregoing papers, it is ordered that this motion is

MOTION IS DECIDED IN ACCORDANCE
WITH ACCOMPANYING MEMORANDUM DECISION.

**MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):**

Dated: 5/24/17                        _____, J.S.C.
                                      HON. ARTHUR F. ENGORON

1. CHECK ONE: ..................................... ☐ CASE DISPOSED          ☑ NON-FINAL DISPOSITION

2. CHECK AS APPROPRIATE: .........................MOTION IS: ☑ GRANTED  ☐ DENIED  ☐ GRANTED IN PART  ☐ OTHER

3. CHECK IF APPROPRIATE: ................................. ☐ SETTLE ORDER          ☐ SUBMIT ORDER

                                      ☐ DO NOT POST   ☐ FIDUCIARY APPOINTMENT   ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 37
----------------------------------------------------------------------------x
In the Matter of Application of 8430985 CANADA INC.,
for Judgment to Compel Turnover of Funds,                    Index Number: 154932/2016

                                    Petitioner,             Motion Seq. No.: 001, 002, 003

            - against -                                     Decision and Order

JACOB FRYDMAN, Judgment Debtor; JFURTI LLC;
JACOB FRYDMAN 2000 IRREVOCABLE TRUST;
MONICA LIBIN 2000 IRREVOCABLE TRUST; and
GOLDMAN SACHS & CO.,

                                    Respondents.
----------------------------------------------------------------------------x
Arthur F. Engoron, Justice

In compliance with CPLR 2219(a), this Court states that the following papers, numbered 1 to 8, were used on (1) the
petition, pursuant to CPLR 5225 and 5227, for a turnover order; (2) petitioner's motion, pursuant to CPLR 3215, for a
default judgment, as against certain respondents; and (3) respondents' motion, pursuant to CPLR 3211(a)(8), to dismiss
the petition:

                                                                            Papers Numbered:
Petition for Turnover of Funds (Seq. 001)
Notice of Petition - Affirmation - Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
Notice of Amended Petition - Affirmation - Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
Notice of Discontinuance (as against defendant Goldman Sachs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

Petitioner's Motion for Default Judgment (Seq. 002)
Notice of Motion - Affirmation - Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
Reply Affirmation - Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

Respondents' Motion to Dismiss (Seq. 003)
Notice of Motion (in lieu of opposition to motion seq. 002) - Affirmation - Exhibits . . . . . . . . . . . . . . . . . . . . . .   6
Affirmation in Opposition to Motion - Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
Reply Affirmation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

Upon the foregoing papers, the petition is granted, and the motions for default judgment and to dismiss are denied.

Background
Petitioner, 8430985 Canada Inc., commenced this special proceeding to attempt to enforce a $2,603,927.77 judgment
("Judgment"), entered on February 5, 2016, in its favor and against non-party United Realty Advisors LP, which has
since changed its name to First Capital Advisors LP ("FCA"), and respondent Jacob Frydman, as guarantor, in the sum of
$1,302,444.80 (under the caption 8430985 Canada Inc. v United Realty Advisors, L.P., et al., Index No. 653564/2014).

The underlying action arises out of a promissory note ("Note"), dated October 24, 2013, that, inter alia, petitioner, FCA,
and Frydman executed, evidencing a $2,500,000 loan petitioner made to FCA. Frydman, whom petitioner alleges
negotiated the Note and was FCA's CEO at the time, executed a personal guaranty ("Guaranty"), guaranteeing half of
FCA's debt. Frydman's former partner, Eli Verschleiser, guaranteed the other half. When FCA defaulted on the Note,
petitioner commenced the underlying action against Frydman and Verschleiser, arguing that, as the Note's guarantors,
they are liable to pay FCA's debts. Justice Kornreich found for petitioner, and the clerk was directed to enter the
Judgment accordingly.

Petitioner alleges that after Justice Kornreich's Decision and Order was entered on August 17, 2015, but before the Judgment was entered on February 5, 2016, Frydman and his controlled, affiliated entities executed certain documents ("the Transaction"), in which they sold control of FCA to non-party First Capital Real Estate Investments LLC ("FCREI"). As a part of the Transaction, Frydman entered into an Assignment and Assumption of Litigation Claims Agreement ("Assumption Agreement"), dated September 15, 2015, whereby Frydman contractually assumed responsibility for the entire Judgment. Petitioner alleges that, pursuant to the Assumption Agreement, Frydman's personal liability, which was originally limited by the Guaranty to only half of the Judgment, was now for the full amount. Pursuant to the Assumption Agreement, Frydman also agreed to indemnify FCA against any and all matters arising from or related to the underlying action. Also as a part of the Transaction, a Consulting Agreement ("Consulting Agreement") was entered into, whereby FCREI and FCA agreed to pay Frydman $500,000 as a consulting fee.

Petitioner alleges: that Frydman, the Judgment Debtor, is a businessman, admitted to practice law in Ohio, who has run numerous public and private companies, with the purpose of orchestrating schemes in order to defraud his creditors; that Frydman has been representing himself in post-Judgment matters and is fully aware of this lawsuit; that respondent Jfurti LLC ("Jfurti") is a Delaware limited liability company under Frydman's sole management and control; and that Jfurti was the recipient of the $2,500,000 Transaction, which Frydman fraudulently conveyed, as it should have remained as part of FCA's assets for petitioner to collect the Judgment upon. Respondents Jacob Frydman 2000 Irrevocable Trust ("JF Trust") and Monica Libin 2000 Irrevocable Trust ("ML Trust"; together with "JF Trust," collectively, "the Trusts"), names, by Frydman's own admission, himself as the sole trustee and beneficiary. Respondent Goldman Sachs & Co. ("Goldman") allegedly has in its custody accounts that belong to Frydman.

Petitioner submits the following information in an attempt to prove that Frydman has substantial assets in his possession, which the Court should direct him to immediately turnover to petitioner in full satisfaction of the Judgment: (1) that Frydman's tax returns from 2012 to 2014 reveal the existence of his "countless" controlled, affiliated entities, through which he is harboring funds; (2) that Frydman received trust payments from the Trusts ("Trust Payments") in the sums of $500,816 in 2012, $483,929 in 2013, and $787,049 in 2014, even though he initially claimed in his information subpoena that he had not received any trust payments; (3) that when Frydman finally acknowledged the Trust Payments, he falsely characterized them as 25-year accruals of 5% on notes owed to him personally by the Trusts; and (4) that Frydman represented to an FDIC (Federal Deposit Insurance Corporation)-insured institution that in 2016, his personal net worth was $154,977,145, including, inter alia, "cash" of $11,250,000 and "notes" of $26,003,602 from seven affiliated entities, which petitioner alleges must be deemed accurate and to constitute admissions against his interest.

Procedural History
On June 13, 2016, petitioner commenced this special proceeding ("Petition"), seeking a declaratory judgment against respondents, declaring that, as a result of the Assumption Agreement, Frydman is liable for the full amount of the Judgment and directing respondents to immediately turn over funds in full satisfaction of the Judgment. Petitioner alleges that since entry of Judgment, it has uncovered substantial assets in the possession, custody, or control of Frydman and his affiliated entities, in particular, a $2,500,000 payment made to Jfurti, stating causes of action, pursuant to New York Debtor Creditor Laws ("DCL") §§ 273-276 and 278, for constructive and/or fraudulent conveyance. Petitioner alleges that Frydman knowingly disbursed FCA's funds in an attempt to prevent execution on the Judgment and to further "line his own pockets." Pursuant to the Assumption Agreement, should petitioner prevail, it also seeks attorney's fees.

On June 16, 2016, three days after the Petition was filed, Frdyman and Jfurti, pursuant to CPLR 5519(a)(2), filed an undertaking, for the face amount of the Guaranty portion of the Judgment against Frydman, exclusive of any statutory interest that had accrued since Justice Kornreich's February 5, 2016 Decision and Order. Petitioner's motion to compel Frydman to post accrued interest on the undertaking is currently before Justice Sherwood.

Petitioner alleges that it made several attempts, pursuant to CPLR 308(1) and 311, to serve the Petition upon Frydman, in his personal capacity, in his capacity as Jfurti's sole manager, and in his capacity as the Trust's sole trustee. Petitioner submits an affidavit of service, dated June 21, 2016, wherein a process server unsuccessfully attempted personal service on June 15, 2016 at 7:26pm, June 17, 2016 at 11:25am, and June 20, 2016 at 2:54pm, at 75 Wall Street, Unit # 32-O, in

Manhattan, the address which Frydman listed as his residence in his response to petitioner's information subpoena. Petitioner submits another affidavit of service, dated June 29, 2016, wherein, pursuant to CPLR 308(4), a process server left the Petition with Frydman's concierge; the Petition was sent back to petitioner with the envelope marked "refused." Petitioner alleges that on each attempt at service, Frydman either refused to accept service or was purported not to be at his residence, with his concierge explaining that it was instructed not to accept legal documents on Frydman's behalf.

On June 27, 2016, Frydman appeared, *pro se*, at an order to show cause ("OSC") hearing before Justice Kornreich, with David C. Wrobel, an attorney at law at Wrobel, Markham, Shatz, Kay & Fox LLP ("Wrobel Firm"), allegedly appearing for two of Frydman's affiliated entities. Petitioner alleges that the Wrobel Firm selectively represents some of Frydman's entities, but has professed not to represent any of the named respondents in this proceeding. Despite allegedly not representing any of the named respondents herein, Wrobel has repeatedly made communications on Frydman's behalf, advising petitioner to discontinue any pending efforts to enforce the Judgment against Frydman. On the hearing date, Justice Kornreich issued a preliminary order restraining funds at Goldman pending a full OSC hearing, then recused herself due to a conflict. Petitioner also alleges that on the date of the hearing, Frydman refused to take copies of the initiating papers for this proceeding.

On June 30, 2016, petitioner filed an Amended Notice of Petition, solely to add Frydman's name to the caption. Petitioner once again attempted service, but the mailing was returned and marked "unclaimed." Petitioner also mailed the Amended Notice of Petition to the Wrobel Firm. On August 12, 2016, Wrobel wrote to petitioner's counsel acknowledging receipt, but stated that he nor the Wrobel Firm represented any of the named respondents.

On July 18, 2016, by way of a second OSC, Frydman, *pro se*, and Wrobel appeared before Justice Sherwood, the presiding judge in the underlying matter. Subsequent to the hearing, Justice Sherwood (1) released the Goldman funds Justice Kornreich previously restrained in his June 27, 2016 order; and (2) dismissed Goldman, without prejudice. By Notice of Discontinuance dated September 19, 2016, petitioners voluntarily discontinued this action against Goldman.

The Instant Action
Before the Court now is (1) the turnover petition, (2) petitioner's motion for a default judgment, and (3) respondents' motion to dismiss.

By motion dated October 11, 2016, petitioner moves, pursuant to CPLR 3215, for a default judgment against Frydman and Jfurti. In support of its motion, it submits, inter alia: multiple affidavits of service, establishing the process servers' attempts to serve respondents; return receipts marked "refused"; a hearing transcript, dated July 18, 2016, establishing Frydman and Wrobel's court appearance in the underlying action; and its attorney's affirmation, establishing respondents' failure to serve an answer.

By motion dated October 28, 2016, respondents move, pursuant to CPLR 306(b) and 3211(a)(8), to dismiss the complaint for failure to serve the petition upon them within 120 days and for lack of personal jurisdiction.

Petitioner alleges that Frydman and Jfurti have subsequently commenced five new lawsuits (Index Nos. 653823/2016, 653824/2016, 653825/2016, 6544157/2016, and 654477/2016) against FCREI and related persons and entities, including FCA, seeking damages in excess of $16,000,000, claiming that FCREI's affiliated entities committed a fraudulent conveyance against *their* interest.

Discussion
The Court will first address the procedural issues of service and default. Petitioner's service of the Petition on respondents was sufficient to establish notice; the record reflects that petitioner made multiple attempts to personally serve Frydman before it properly served respondents, pursuant to CPLR 308(4), by leaving the papers with the building's concierge. See Al Fayed v Barak, 29 AD3d 371, 372 (1st Dept 2007) ("service was properly left with the doorman of defendant's building, access to the building having been prohibited to the process server, who was informed that defendant was not at home"). Service is deemed sufficient when it puts respondents on notice of the subject proceeding

Page 3 of 5

and gives them an opportunity to defend themselves. See Manhattan Savings Bank v Annuziato, 268 AD 672, 675 (1st Dept 1945) ("The object of all service of process is said to be to give notice to the party on whom service is made, that he may be aware of and may resist what is sought of him, and it is a general rule that any service *must* be deemed sufficient which renders it reasonably probable that the party proceeded against will be apprised of what is going on against him, and have an opportunity to defend") (emphasis added). Here, Frydman, by virtue of the fact that he made several court appearances in the underlying action, and that he opposed the Petition, is deemed to have received notice of the instant proceeding and have had an opportunity to defend against petitioner's claims. Thus, respondents are deemed to have been properly served, conferring on this Court jurisdiction over them. For the same reasons, and in the interests of reaching the merits of this matter, this Court, in its discretion, finds that Frydman and Jfurit are not in default, as they have appeared by way of making a motion to dismiss the Petition. See CPLR 2004 ("the court may extend the time fixed by any statute, rule or order for doing any act").

Pursuant to CPLR 5225(b), a judgment-creditor may commence a special proceeding against

> a person in possession or custody of money … in which the judgment debtor has an interest, … where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, [in which case] the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor.

Similarly, CPLR 5227 permits a judgment-creditor to commence a special proceeding against "any person who it is shown is or will become indebted to the judgment debtor." There is "overlap" between CPLR 5225(b) and 5227 when a judgment-creditor is seeking to attach money. See David D. Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C5227:1, C5227:3. Special proceedings under CPLR 5225(b) and 5227 are governed by Article 4 of the CPLR, for which summary relief may be granted only where the submissions of the parties show that there is no genuine dispute as to any material fact, and that the petitioner is entitled to judgment as a matter of law. See CPLR 409(b) ("The court shall make a summary determination upon the pleadings, papers and admissions to the extent that no triable issues of fact are raised. The court may make any orders permitted on a motion for summary judgment."); see also Karr v Black, 55 AD3d 82, 86 (1st Dep't 2008) ("it is settled that a special proceeding is subject to the same standards and rules of decision as apply on a motion for summary judgment, requiring the court to decide the matter 'upon the pleadings, papers and admissions to the extent that no triable issues of fact are raised.'").

Petitioner has established its entitlement to recover on its fraudulent conveyance claim. Pursuant to DCL § 273-a, in order to prevail on their claim that the conveyance of funds from FCA to Jfurti was not fraudulent, respondents must demonstrate that Frydman was a good-faith seller of his and his affiliates' control over FCA, or that Jfurti was a good-faith purchaser that paid fair consideration without knowledge of any fraud. See DCL § 273-a ("Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action"). Respondents have failed to demonstrate either to rebut petitioner's fraudulent conveyance claim. See Sardis v Frankel, 113 AD3d 135, 142 (1st Dept 2014) ("Where the transferor has knowledge of a judgment, the transfer of funds available to satisfy the judgment made at the judgment debtor's direction will be set aside as lacking in good faith. Likewise, where the transferee is aware of an impending enforceable judgment against the transferor, the conveyance does not meet the statutory good faith requirement and generally will be set aside as constructively fraudulent"). It is apparent from the record that Frydman's conveyance of the subject funds to Jfurti was only one in a series of transactions undertaken as part of an "asset protection plan" devised by Frydman to place FCA's assets beyond petitioner's reach. The lack of good faith on Frydman's part, as transferor, affords a sufficient basis to set aside this transfer as constructively fraudulent. The Court notes that Jfurti likewise has not provided sufficient proof to raise a triable issue of fact concerning whether it took the funds as a good-faith purchaser for value without knowledge of any fraud.

Petitioner has also established its entitlement to the funds it seeks to have turned over to it. Pursuant to CPLR 5225, petitioner has established its entitlement to possession of the funds it seeks (*i.e.* the Judgment in its favor and against Frydman, and the Assumption Agreement wherein Frydman assumed responsibility for the entire Judgment amount),

and, as such, the Court may require respondents to pay money in full satisfaction of the Judgment. The record reflects that respondents fraudulently conveyed FCA's funds when, instead of using any portion of the $2,500,000 to repay the Judgment against FCA, Frydman pocketed the funds, by way of transferring them to Jfurti, one of his wholly-owned affiliated companies. Frydman has not hoodwinked the Court into believing that he was unaware that the conveyance would impact FCA's ability to repay the Judgment.

Petitioner has also established its entitlement to seek repayment of the Judgment from the Trusts, as Frydman, the Judgment Debtor, is the sole trustee of both trusts. Frydman's 2012-2014 tax returns prove that he has received the Trust Payments, and, thus, that he personally has the funds to, at the very least, partially satisfy the Judgment.

The Court has considered respondents' other arguments and finds them unavailing.

Accordingly, the parties' submissions show, and this Court finds, that respondents have in their possession the funds necessary to, at the very least, partially satisfy the Judgment and directs respondents to immediately turn such funds over to petitioner for immediate application against the Judgment. Thus, petitioner's petition is granted, petitioner's motion for default judgment is denied, and respondents' motion to dismiss is denied.

<u>Conclusion</u>
Petition granted; motion for default judgment denied; motion to dismiss denied. The clerk is hereby directed to enter judgment directing respondents to turnover the funds to petitioner for immediate application against the $2,603,927.77 judgment Justice Kornreich issued against respondent Jacob Frydman, in his individual capacity as non-party First Capital Advisors LP's guarantor.

Petitioner's request for reasonable attorney's fees and costs is hereby severed and referred to a special referee to hear and report (CPLR 4311). In order to obtain a hearing with a special referee, petitioner may submit to Room 119 a copy of this Decision & Order and notice of entry, together with a Special Referee Info Sheet (http://nycourts.gov/courts/1jd/supctmanh/refpart-infosheet-10-09.pdf).


Dated:  <u>May 24, 2017</u>

                                        _____
                                        Arthur F. Engoron, J.S.C.



Page 5 of 5

EXHIBIT D

## SETTLEMENT AGREEMENT

This Settlement Agreement ("*Agreement*") is made and entered into as of this ⎿⎺⎤ day of August 2015, by and between Philip Alex Veen ("*Alex*"); Sofia Svishch ("*Sofi*"); Jacob Frydman ("*Frydman*"); Prime United Holdings, LLC ("*Prime*"); and United Realty Advisors, L.P. ("*United*") (Alex and Sofi are each individually referred to as a "*Party*" and collectively referred to as the "*Veen Parties*"; and Frydman, Prime and United are each individually also referred to as a "*Party*" and collectively, together with their respective Affiliates (as herein defined) referred to as the "*Frydman Parties*"; and the Veen Parties and the Frydman Parties are collectively referred to as the "*Parties*").

### RECITALS

**WHEREAS,** certain disputes have arisen among the Parties;

**WHEREAS,** a consolidated lawsuit with respect to such disputes is currently pending in the United States District Court for the Southern District of New York styled as *Frydman, et al v. Verschleiser, et al,* Case Nos. 14 Civ. 5093 and 14 Civ. 8084 (the "*Lawsuit*");

**WHEREAS,** the Parties have agreed to settle their disputes as hereinafter set forth;

**NOW, THEREFORE,** in consideration of the mutual promises hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Dismissal of the Lawsuit.** Simultaneously with the execution of this Agreement, the Frydman Parties, by their respective counsel, shall execute the Notice of Voluntary Dismissal of the Veen Parties from the Lawsuit in the form attached hereto as Exhibit "A" (the "*Stipulation*") and counsel for the Frydman Parties shall cause the Stipulation to be e-filed with the Court.

2. **Release of Claims.**

(a) For valuable consideration, the sufficiency of which is hereby acknowledged, upon the execution hereof, but subject to Alex's faithful performance of his obligations and agreements made in paragraphs 4, 6, 7, 8 and 12 hereof, the Frydman Parties and each of their successors and assigns (the "*Frydman Releasors*"), do hereby RELEASE AND FOREVER DISCHARGE the Veen Parties, and each of their successors and assigns (the "*Veen Releasees*"), from any and all liability for all claims, suits, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, both past and present, whether known or unknown, suspected, or claimed, whether now or hereafter discovered, foreseen or unforeseen, arising out of, or in any way connected to, or which arose as a result of, any act, failure to act, agreement, obligation, undertaking, or any matter whatsoever which arose, was made, entered into or undertaken prior to the date hereof, or with respect to any event, circumstance, act or omission, agreement, and/or undertaking created or effected prior to the date hereof, and/or any acts

1

FRYDMAN 00011874

and/or omissions occurring, from the beginning of the world up to and including the date hereof. This release will survive the transactions contemplated herein, provided, however, that in the event that a court determines that Alex breached or failed to faithfully perform all of the obligations and agreements made in paragraphs 4, 6, 7, 8 and 12 hereof, then the release provide in this paragraph 2(a) shall be null and void ab initio.

(b) For valuable consideration, the sufficiency of which is hereby acknowledged, upon the execution hereof, but subject to the Frydman Parties performance of their obligations under this Agreement, the Veen Parties and each of their successors and assigns (the "*Veen Releasors*"), do hereby irrevocably and unconditionally RELEASE AND FOREVER DISCHARGE the Frydman Parties, and each of their successors and assigns (the "*Frydman Releasees*"), from any and all liability for all claims, suits, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, both past and present, whether known or unknown, suspected, or claimed, whether now or hereafter discovered, foreseen or unforeseen, arising out of, or in any way connected to, or which arose as a result of, any act, failure to act, agreement, obligation, undertaking, or any matter whatsoever which arose, was made, entered into or undertaken prior to the date hereof, or with respect to any event, circumstance, act or omission, agreement, and/or undertaking created or effected prior to the date hereof, and/or any acts and/or omissions occurring, from the beginning of the world up to and including the date hereof. This release will survive the transactions contemplated herein, provided, however, that in the event that that a court determines that any of the Frydman Parties breached or failed to faithfully perform all of their obligations made in this Agreement, then the release provide in this paragraph 2(b) shall be null and void ab initio.

(c) The release in favor of the Veen Parties set forth in subparagraph 2(a) above, does not, and shall not, in any way, directly or indirectly, release any joint tortfeasor who acted with the Veen Realsees, or any other person who is now or may hereafter be a defendant in the Lawsuit, and all claims, suits, actions, causes of action, cross-claims, counter-claims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or other liabilities against any such persons are expressly reserved by the Frydman Parties, and shall not in any way release or otherwise exonerate any such persons, and all of the Frydman Parties' claims, causes of action, cross-claims and/or counter-claims which have been, could have been, or which may hereafter be, brought by any of the Frydman Parties in the Lawsuit, or in any other suit, action, arbitration or other proceeding against any person not herein released are expressly preserved, unaffected by, and continuing, and are in no way affected by the release set forth in subsection 2(a) hereof.

### 3. Covenant Not to Sue.

(a) Upon the execution hereof, but subject to Alex's faithful performance of his obligations and agreements made in paragraphs 4, 6, 7, 8 and 12 hereof, other than a suit seeking enforcement of this Agreement, the Frydman Releasors, on behalf of themselves, their respective Affiliates, heirs, successors and assigns, represent, warrant, covenant and agree not to initiate, institute, commence, maintain, join, prosecute, incite others to prosecute, or assist

2

FRYDMAN 00011875

others in prosecuting any claim, lawsuit, arbitration or other proceeding for any relief whatsoever relating in any way to any of the Veen Releasees for any matter arising out of, or in any way connected to, or which arose as a result of, any act, failure to act, agreement, obligation, undertaking, or any matter whatsoever which arose, was made, entered into or undertaken prior to the date hereof. This Covenant not to sue the Veen Releasees will survive the transactions contemplated herein, provide, however, that in the event that a court determines that Alex breached or failed to faithfully perform all of the obligations and agreements made in paragraphs 4, 6, 7, 8 and 12 hereof, then this covenant not to sue the Veen Releasees provided in this paragraph 3(a) shall be null and void ab initio.

(b) Upon the execution hereof, but subject to the Frydman Parties performance of all of their obligations under this Agreement, other than a suit seeking enforcement of this Agreement, the Veen Releasors, on behalf of themselves and each of their respective Affiliates, heirs, successors and assigns, represent, warrant, covenant and agree not to initiate, institute, commence, maintain, join, prosecute, incite others to prosecute, or assist others in prosecuting any claim, lawsuit, arbitration or other proceeding for any relief whatsoever relating in any way to any of the Frydman Releasees for any matter arising out of, or in any way connected to, or which arose as a result of, any act, failure to act, agreement, obligation, undertaking, or any matter whatsoever which arose, was made, entered into or undertaken prior to the date hereof. This Covenant not to sue the Frydman Releasees will survive the transactions contemplated herein, provide, however, that in the event that a court determines that any of the Frydman Parties breached or failed to faithfully perform all of their obligations under this Agreement, then the covenant not to sue provided in this paragraph 3(b) shall be null and void ab initio.

4. **Cooperation of the Parties.** As a material inducement to the Frydman Parties entering into this Agreement, Alex hereby agrees to fully cooperate with the Frydman Parties in the continued prosecution of the Lawsuit against the other defendants who are not subject to this Agreement, and in connection therewith Alex hereby agrees:

(a) to deliver to the Frydman Parties as hereinafter provided:
(i) electronic copies of all emails in Alex's possession or control which Alex received from, or sent to, each of the EV Persons (as hereafter defined) from December 2, 2013 through the date hereof as well as any emails which Alex may hereafter receive from, or send to, any of the EV Persons, in each case, with sufficient information to be able to identify the sender, recipient, date, and subject (if any), and all attachments thereto (the "*EV Emails*"); (ii) electronic copies of all text messages in Alex's possession or control which Alex received from, or sent to, each of the EV Persons from December 2, 2013 through the date hereof, as well as any text messages which Alex may hereafter receive from, or send to, any of the EV Persons hereafter, each in screenshot or PDF and, if possible, native form, in each case identifying the sender's and recipient's telephone number and other identifying information (the "*EV Texts*"); (iii) electronic copies of all recorded telephone or other conversations in Alex's possession or control which Alex had with each of the EV Persons from December 2, 2013 through the date hereof, as well as any recorded telephone or other conversations with any of the EV Persons which Alex may hereafter have, in MP3 or Wav format, together with a log identifying, as to each recorded call file, the name of the file, the date of the conversation, the

3

persons participating in the conversation and a brief description of the matters discussed (the "*EV Calls*"); (iv) copies of all electronic files of every type received by Alex in Alex's possession or control from any of the EV Persons, in the form received, from December 2, 2013 through the date hereof as well as any electronic files of every type which Alex may hereafter receive from any of the EV Persons (the "*EV Files*"); (v) a written list of all websites, URLs, and other internet postings made, uploaded or posted of which Alex is aware, which constitute a component of the EV Smear Campaign (as hereafter defined) or which in any way discuss or refer to the Frydman, the other Frydman Parties or any of them, which were created, uploaded, posted, or hosted since December 2, 2013, and as to each, a copy or screenshot of same, and if known to Alex, a log identifying the persons who conceived, created, uploaded, posted and hosted same, the persons responsible for, and who in any way had any involvement with, same; the domain name associated with same, the name of the owner of said domain, the log-ins and passwords needed to access or modify or remove same; the internet address to access same; the person who paid for same; the person hosting same (together with such persons' contact information); and if in Alex's custody or control, copies of all receipts for the establishment, posting, hosting or purchasing same (the "*URL Log*"); (vi) electronic copies of all other documentary or electronic evidence which Alex has in his possession or control which in any way supports any of the claims asserted by the Frydman Parties in the Lawsuit, and which in any way relates to Eli Verschleiser's campaign to smear, destroy, injure, damage or otherwise cause harm financially, reputationally, physically, and any other way to the Frydman Parties (the "*EV Smear Campaign*"), including, without limitation, Alex's description of conversations between Eli Verschleiser and the EV Ring's plans with his personal honest interpretation of the tone of conversations, but without any electronic or documentary proofs of such conversations, during which Eli Verschleiser  discussed the issues such as: to kill, physically injure, inject, set-up, discredit, compromise (including, without limitation, Eli Verschleiser's offer to Alex to do any of the foregoing and to pay Alex $50,000 to hire prostitutes to coerce Frydman into a situation from which Eli Verschleiser could attempt to blackmail him and which could be videotaped and sent to Frydman's wife and others), or in any other way harm Frydman, his Family members or Affiliates, (the "*Other Evidence*"); (vii) a written list of all email addresses and IP addresses known to Alex to have been used by Eli Verschleiser at any time from and after December 2, 2013 (the "*Email/IP Log*"); (viii) a written list of all persons known to Alex to have in any way, directly or indirectly, cooperated, participated, assisted, provided goods or services to, or was otherwise involved in, the EV Smear Campaign, and if known to Alex, such person's name, address, email, telephone number, employer, and a description of such person's activities or other involvement in the EV Smear Campaign (the "*Participant Log*"); (ix) a written list of all known to Alex hardware, software, devices, electronic accessories and services used by Eli Verschleiser and every other person involved in the EV Smear Campaign to hide or mask their identities, IP addresses or ability to trace such person's activities since December 2, 2013, and as to each, a description of the hardware, software, devices, electronic accessories and services used, the purpose for which same was used, the person who provided same, the person who was responsible for obtaining and paying for same, and if available to Alex, all electronic or documentary evidence pertaining to the foregoing (the "*Device Log*");

4

and (x) a narrative description of all discussions or other communications in which Alex participated or overheard which are not included in the EV Calls, in which Eli Verschleiser directly or indirectly, proposed, considered, threatened, suggested, sought to recruit persons to participate in, organized, conceived, or otherwise discussed any plans to harm, discredit, compromise, or in any other way harm Frydman, the other Frydman Parties including, without limitation, Frydman's Family members or Affiliates, and in connection therewith, identify the approximate date of such conversations, the persons who participated or overheard such conversations, a description of each plan, and to the extent known to Alex, the persons who were being recruited or considered by Eli Verschleiser to carry out or effect such plan (including their contact information), any offers made by Eli Verschleiser to any person in connection with such plans, and a brief description of the activities undertaken by Eli Verschleiser or other members of the EV Ring in furtherance of such plans (the "*Plans Narrative*"); Alex's obligations under this subsection 4 (a)will be deemed faithfully and duly performed after Alex sends all items (information, documents, mails, files, audio, etc.) as set forth above in subsections 4 (a) – 4 (x) in his possession or control electronically to Frydman, and in the event that Alex inadvertently missed certain non-material items, he will follow up with such items as they become known or available.

(b) to make himself available by telephone, conference call, skype, or other electronic medium, or in person in Lviv, Kiev or other places in Ukraine, (or if Alex shall be in the United States, in person, in the United States at the places where Alex is visiting) as reasonably requested by the Frydman Parties, and each of the foregoing's attorneys, agents, representatives and consultants, from time to time, after the date hereof and until the earlier to occur of a final settlement or rendering of a final, nonappealable judgment in the Lawsuit, to truthfully answer questions, provide information, records, documents, electronically stored information, recordings, emails, texts, logs, and other evidence of every kind and description which Alex has in his possession or control, and which can be used by the Frydman Parties, as determined by the Frydman Parties in their absolute discretion, in prosecuting the claims asserted by them in the Lawsuit and any other claims, causes of action or proceedings, at law, in equity or by arbitration which are currently pending, or which may hereafter be initiated against Eli Verschleiser, the other members of the EV Persons and each of the foregoing's respective Affiliates, agents, representatives, and all persons directly or indirectly, acting in concert with each of the foregoing (collectively, the "*EV Ring*"), regarding the matters asserted by the Frydman Parties in the Lawsuit and otherwise as requested by the Frydman Parties, including, but not limited to, to the EV Smear Campaign, all other undertakings by or on behalf of Eli Verschleiser and/or any member of the EV Ring, to financially, physically, emotionally, reputationally, civilly, criminally, or in any other way harm or injure, and disparage, defame, cause losses to, impact, harass, affect, embarrass, otherwise damage the Frydman Parties (the "EV Bad Acts");

(c) within sixty (60) days after the execution hereof, to execute, and deliver to the Frydman Parties Alex's affidavit sworn to by Alex as true and correct under penalties of perjury and signed, witnessed and notarized as required to be admissible as a sworn affidavit in

5

the US District Court for the Southern District of New York, and otherwise in form and substance mutually acceptable to Alex and the Frydman Parties, setting out in reasonable detail all the facts relating to Alex's long-term relationship with Eli Verschleiser, Verschleiser's recruitment of Alex to participate in the EV Smear Campaign and Verschleiser's other wrongful acts against Frydman and the other Frydman Parties, the matters asserted by the Frydman Parties in the Lawsuit with respect to which Alex has knowledge, the acts undertaken by Eli Verschleiser and the other members of the EV Ring in perpetrating the EV Smear Campaign, the EV Bad Acts, and otherwise setting forth additional facts relating to Verschleiser's long-term, on-going the details of Eli Verschleiser's plans, efforts, strategy and overt acts, alone and with other members of the EV Group to financially, physically, emotionally, reputationally, civilly, criminally, and otherwise harm, injure, disparage, defame, cause losses to, impact, harass, affect, embarrass, and otherwise damage Frydman, his businesses and the Frydman Parties;

(d) to voluntarily accept service of a subpoena by email, and pursuant to said subpoena, voluntarily appear at a mutually agreeable time, at the United States Embassy in Kiev, Ukraine or such other location mutually acceptable to Alex and the Frydman Parties, to give testimony under oath, under an applicable treaty or convention; under a letter of request, whether or not captioned a "letter rogatory"; on notice, before a person authorized to administer oaths either by US federal law or by the law of Ukraine; or before a person commissioned by the US Federal Court, SDNY, to administer any necessary oath and take testimony, and thereat to be deposed by Frydman and the Frydman Parties' lawyers, before a stenographer and videographer, in accordance with the US Federal Rules of Civil Procedure, and testify, truthfully, as to the matters asserted by the Frydman Parties in the Lawsuit with respect to which Alex has knowledge, the acts undertaken by Eli Verschleiser and the other members of the EV Ring in perpetrating the EV Smear Campaign, the EV Bad Acts, and otherwise setting forth additional facts relating to Verschleiser's long-term, on-going the details of Eli Verschleiser's plans, efforts, strategy and overt acts, alone and with other members of the EV Group to financially, physically, emotionally, reputationally, civilly, criminally, and otherwise harm, injure, disparage, defame, cause losses to, impact, harass, affect, embarrass, and otherwise damage Frydman, his businesses and the Frydman Parties;

(e) to voluntarily accept service of a trial subpoena by email, and pursuant to said subpoena, voluntarily appear at the US courthouse in Manhattan, and testify at the trial conducted with respect to the Lawsuit, and thereat, truthfully give testimony under oath, as to the matters asserted by the Frydman Parties in the Lawsuit with respect to which Alex has knowledge, the acts undertaken by Eli Verschleiser and the other members of the EV Ring in perpetrating the EV Smear Campaign and the EV Bad Acts and otherwise relating to Verschleiser's long-term, on-going plans, efforts, strategy and overt acts, alone and with other members of the EV Ring to financially, physically, emotionally, reputationally, civilly, criminally, and otherwise harm, injure, disparage, defame, cause losses to, impact, harass, affect, embarrass, and otherwise damage Frydman, his businesses and the Frydman Parties; and

6

(f) to come to the United States at least one week prior to the scheduled date on which Alex is scheduled to give testimony as set forth is subsection 4(e), and to be available at least fifty percent (50%) of his time during said one week period to meet with Frydman and the Frydman Parties and their attorneys to discuss and prepare for his trial testimony.

5. **Settlement Payment.**  In consideration of the Veen Parties' agreements and promises as herein provided, and Alex's time and effort in fulfilling his obligations as set forth in Section 4 herein, the Frydman Parties hereby agree to pay to Alex the following sums:

(a) Within one (1) business day of receipt by the Frydman Parties of the Lawfirm Notification (as hereafter defined), the sum of Seventy Five Thousand US Dollars ($75,000.00) by wire transfer of immediately available funds to an account designated in writing by Alex and set forth in the Lawfirm Notification.  Upon Receipt of the Deliverables as set forth in Section 6 below by the lawfirm representing the Veen Parties (the "Lawfirm") shall send the Frydman Parties a written notice, by email, that the Deliverables as set forth in Section 6 below have been received by the Lawfirm in electronic form from Alex, and setting forth the account to which the Seventy Five Thousand US Dollars ($75,000.00) is to be wired (the "Lawfirm Notification").  Upon confirmation by the Lawfirm of receipt of the funds by Alex, the Lawfirm shall immediately send the Deliverables to the Frydman Parties by Dropbox or other electronic transmission to Frydman's email address.

(b) not later than one (1) business day prior to the scheduled date of Alex's deposition as set forth in sub-section 4(d) above, the sum of One Hundred Thousand US Dollars ($100,000.00) by wire transfer of immediately available funds directly to the Alex's bank account stated in this Agreement;

(c) not later than one (1) week prior to the scheduled date of Alex's trial testimony as set forth in sub-section 4(e) above, and provided that Alex is in New York on such date to meet with the Frydman Parties and their counsel for trial preparation as set forth in section 4(f), the sum of One Hundred Thousand US Dollars ($100,000.00) by wire transfer of immediately available funds to the Alex Bank account stated in this Agreement; and

(d) the costs of air fare transportation and lodging for Alex to and from New York for trial preparation and trial testimony.

In the event that Alex fails to perform any component of the  Cooperation of the Parties as such cooperation is stipulated in of paragraph 4  hereto, due to the circumstances which were beyond his control, the Frydman Parties are **not** entitled to any reimbursement or return of the amount which were already transferred (paid) to Alex as settlement payment for the due performance of the obligations under other sub-paragraphs of paragraph 4.

7

FRYDMAN 00011880

**6. Deliverables**. Within ten (10) days of the date hereof, Alex shall deliver to the Lawfirm, all of the EV Emails, EV Texts, EV Calls, EV Files, URL Log, Other Evidence, Email/IP Log, Participant Log, Device Log and Plans Narrative as defined in Subsection 4(a) hereof which are in Alex's possession or control (collectively, the "*Deliverables*") to be held and released by the Lawfirm as set forth in subsection 4(a). The Parties agree and acknowledge that the Lawfirm is acting as an accommodation to the Parties and that nothing contained herein shall be deemed to create any liability on the part of the Lawfirm.

If Alex shall fail to: (i) timely deliver the Deliverables to the Lawfirm as herein set forth and further to deliver the Deliverables to Frydman after receipt of payment as set forth in Section 5(a) hereof; (ii) appear and provide testimony for his scheduled deposition as contemplated in subsection 4(d); or (iii) appear and provide testimony for his scheduled trial appearance as contemplated in subsection 4(e), then in any such event, on the fifth (5th) day after the scheduled date for Alex's performance, the Releases and Covenants not to sue running in favor of the Veen Parties provided in subsections 2(a) and 3(a) herein shall automatically terminate and be deemed null and void ab initio, the Releases and Covenants not to sue provided in subsections 2(b) and 3(b) herein by the Veen Parties in favor of the Frydman Parties shall continue in full force and effect, and the Frydman Parties' obligations to make the payments to Alex or the Veen Parties as set forth in Section 5, and Alex or the Veen Parties' right to receive the payments set forth in section 5 hereof, shall terminate and be deemed waived by the Parties hereto.

Nothing contained herein shall guaranty any particular outcome in the Lawsuit and a non-favorable outcome to the Frydman Parties in the Lawsuit shall not subject the Veen Parties to any claim of a breach of this Agreement or a failure to perform under this Agreement.

**7. Representations**. Each Party hereto represents and warrants that (i) he/she/it has the power and authority to execute and deliver this Agreement; (ii) his/her/its execution, delivery, and performance of this Agreement does not and will not contravene the terms of any applicable agreements, instruments, or laws; (iii) he/she/it has the power and authority to perform his/its obligations hereunder; and (iv) he/she/it has not assigned or transferred or purported to assign or transfer to any person or entity all or any portion of any claim, right, interest, or other entitlement which is agreed to be dismissed or released herein. Alex hereby represents and warrants to the Frydman Parties that the information provided to Frydman with respect to Eli Verschleiser's involvement with the EV Smear Campaign and the EV Bad Acts during the period of August 6 – 8, 2015, are true and correct and fairly represent the facts, and that Alex has the evidence to back up those claims, which evidence shall be included in the Deliverables, Alex's affidavit as contemplated in subsection 4(b), Alex's deposition testimony as contemplated in subsection 4(c), and Alex's trial testimony as contemplated in subsection 4(d).

**8. Further Assurances and Undertakings.** As a material inducement to the Frydman Parties to enter into this Agreement, each of the Veen Parties hereby represents, warrants, covenants, and expressly agrees that from and after the date hereof, the Veen Parties will not, directly or indirectly, nor will they induce, assist or cause any other person, directly or indirectly to:

8

(i)     participate with, cooperate with, act in concert with Eli Verschleiser, including, without limitation, in any way in connection with the Lawsuit or any other suits, proceedings or arbitrations in which Frydman or any of his Affiliates is now or hereafter involved against Eli Verschleiser or any other member of the EV Ring or take any action whatsoever with, for, or on behalf of, Eli Verschleiser or any other member of the EV Ring in any way in furtherance of the EV Smear Campaign, the EV Bad Acts or in any other way to smear, destroy, injure, damage or otherwise cause harm financially, reputationally, physically, and any other way to the Frydman Parties or any of them;

(ii)    create, publish or post any statements about Frydman, any of the Frydman Parties, or any entity, association, business, or companies which employ Frydman or any of his family members, or in which Frydman or any of his family members have any interest whatsoever, or of which Frydman is directly or indirectly affiliated, or is an officer, director, owner, manager, partner, trustee, beneficiary, control person, or in any other way directly or indirectly involved, and each of the foregoing's respective officers, managers, employees, partners, agents, servants, attorneys, representatives, products, goods, or services, (collectively the "Frydman Entities"), including, without limitation, any statements which defame, disparage, or contain libelous statements about the Frydman Entities;

(iii)    use, create, publish or post Frydman's or any of the Frydman Entities' name or likeness, or any name, mark or internet domain name that incorporates any of the Frydman Entities' names or marks or any names or marks which are confusingly similar to or a colorable imitation of any of the Frydman Entities' names or marks or any name or mark associated with any of the Frydman Entities, or any name or mark which is confusingly similar to or a colorable imitation thereof (collectively, the "Frydman Marks");

(iv)    use or display the Frydman Marks on any websites, domains, blogs, internet postings or advertising, emails, communications, products, or promotional materials in any manner whatsoever, including, without limitation, in any false, disparaging and/or deceptive manner;

(v)    use the names of any of the Frydman Entities or the Frydman Marks in any manner in any name, mark or internet domain name that incorporates any of the Frydman Entities' names or the Frydman Marks, or which is confusingly similar to or a colorable imitation of such names;

(vi)    do any act or thing calculated or likely to cause confusion or mistake in the minds of members of the public or prospective customers, investors or business associates or any person with whom any of the Frydman Entities may have or may develop a business relationship or business opportunity, as to any of the Frydman Entities or any businesses, investments, offerings, products or services sponsored or offered by any of the Frydman Entities as to the knowledge, credibility, trustworthiness, veracity, ethics, performance, performance results, dependability,

FRYDMAN 00011882

honor, credibility, responsibility, desirability, capability, or source of the products, investments or services offered for sale, distributed, or sold, or which is likely to disparage any of the Frydman Entities or deceive members of the public, or prospective customers, investors or business associates, or which is likely to confuse such persons into believing that there is some connection between any of the Veen Releasees and any of the Frydman Entities;

(vii)   take any actions which will or which may, or make any statements to any person which will or which may, in any way, directly or indirectly, tarnish, blur, disparage or dilute, or are which are likely to tarnish, blur, disparage or dilute, any of the Frydman Entities or the Frydman Marks;

(viii)  make any statements to any person in any way that any of the Frydman Entities have acted in any improper manner, or which reveal any information about any of the Frydman Entities which has not been consented to in writing, in advance by the Frydman Entities who are the subject of any such statements;

(ix)   make or induce others to make any disparaging, false, misleading, or deceptive statement of fact, or representation of fact regarding any of the Frydman Entities or any of their businesses, products, investments, offerings, transactions, properties, developments or services to any person;

(x)    solicit, induce or influence any person who has a business relationship with any of the Frydman Entities to discontinue or reduce the extent of such relationship in any manner, or to bring or threaten to bring any suit, action or arbitration against any of the Frydman Entities;

(xi)   purchase or otherwise acquire, or induce or assist any person in purchasing or otherwise acquiring, any interest, directly, or indirectly, in any debt, obligation, contract or instrument known to the Veen Releasees as one in which any of the Frydman Entities, directly or indirectly have an interest, or are obligors, or to which any of the Frydman Entities are parties;

(xii)  recruit, solicit or otherwise induce or influence any employee, investor, business associate, lender, counterparty, contractor, consultant or advisor of or to any of the Frydman Entities to discontinue or reduce such person's relationship with any of the Frydman Entities, or to bring or threaten to bring any suit, action or arbitration against any of the Frydman Entities;

(xiii) disparage in any way, or to any person, in any communications, whether in writing or orally, in a manner that could reasonably be expected to in any way, is intended to, or which does, disparage or otherwise injure the business or reputation of any of the Frydman Entities; and

(xiv)  be Affiliated in any way with any person which does any of the things which are prohibited under Sections 6(a)(i) through (xv) above.

10

**9. Remedies Upon Breach of this Agreement.** In addition to, and without limiting, any other remedy or right that a non-breaching Party might have against a breaching Party, each Party shall also have the right to the following relief:

      (a)    **Injunction.** Each Party is entitled to obtain a temporary and permanent injunction restraining any breach of this Agreement, since the Parties' remedies at law are inadequate. No bond or other security shall be required in obtaining such equitable relief

      (b)    **Specific Enforcement.** Each Party is entitled to have such representation, warranty, covenant or agreement specifically enforced by any court having jurisdiction, it being acknowledged and agreed that any breach of any of such representation, warranty, covenant or agreement will cause irreparable injury to the non-breaching Party to whom such representation, warranty, covenant or agreement was made and that money damages will not provide an adequate remedy.

      (c)    **Other Remedies.** Nothing contained in subsections 9(a), 9(b) and/or 9(c) shall be construed as exclusive or as prohibiting a non-breaching Party from pursuing any other remedies available for a breach or threatened breach of any representation, warranty, or covenant, or for the breach of any other provisions of this Agreement.

**10. Further Remedies.** If any Party shall have been found by a court of competent jurisdiction to have breached the provisions of this Agreement then, in addition to the remedies available hereunder, or available at law or in equity, the breaching Party shall also be liable for full payment of the non-breaching Party's actual costs, actual disbursements and actual attorney's fees (or if the non-breaching Party represents himself pro se, for the non-breaching Party's time at the rate of $500 per hour for such pro se representation (the "pro se fees")) with respect to the bringing of any action to enforce the terms hereof.

**11. Indemnification.**

    (a) The Veen Parties hereby agree, jointly and severally, to indemnify, defend, and hold the Frydman Parties and the Frydman Entities harmless against any and all claims and all losses, reasonable attorneys' fees, and costs related to any of the Veen Parties' breach of any representation, warranty, covenant or agreement contained in this Agreement, including, without limitation, a breach affecting any of the Frydman Entities.

    (b) The Frydman Parties hereby agree, jointly and severally, to indemnify, defend, and hold the Veen Parties harmless against any and all claims and all losses, reasonable attorneys' fees, and costs related to any of the Frydman Parties' breach of any representation, warranty, covenant or agreement contained in this Agreement, including, without limitation, a breach affecting any of the Veen Parties.

11

**12. Confidentiality.** The Parties expressly agree that the terms and conditions of this Agreement are strictly confidential and that the parties shall not voluntarily discuss, publicize, or disseminate any information or materials relating to the contents and execution of this Agreement, provided, however, that the Parties may disclose the terms of the Agreement:

(i) to their attorneys accountants, banks and other professionals working with any of the Parties who have a need to know and who expressly agree not to further disclose the terms of this Agreement to any other person; (ii) for purposes of enforcing a Party's rights in connection with any legal proceeding or in the event of a breach of this Agreement; or (iii) in response to any inquiry from a subpoena or as otherwise required by applicable law; provided that, with respect to clause (iii), if a Party is requested or required to disclose the Agreement, that Party will notify the other Parties promptly of the request or requirement so that the other Parties may seek an appropriate protective order or waive compliance with the provisions of this section.

**13. Certain Definitions.** For purposes hereof:

(a) "Affiliate", "affiliate", "Affiliates", "affiliates" or "affiliated with" means with respect to any person, any other person which is controlling, controlled by, or under common control with (directly or indirectly through any person) the person referred to, and, if the person referred to is a natural person, a family member of such person.

(b) "Control" (including, with correlative meaning, the terms "controlled by" and "under common control with") or "controlling" as used with respect to any person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract or otherwise.

"EV Persons" means Eli Verschleiser, Albert Akerman, David O. Wright, Raul Delforno, Ophir Pinhasi, Alex Onica, Alexander Merchansky, Mark Appel, Abe George, Asher Gulko, Joseph Speizio, Ahuva Slomovitz, Multi Capital Group Of Companies, LLC and all persons who are parties in any Action in which Eli Verschleiser or any of Eli Verschleiser's Affiliates are also parties (the "EV Parties") and in which Actions Client or any of Client's Affiliates are also parties and are adverse to any of the EV Parties, and each of the forgoing's employees, attorneys, agents, officers, directors, owners, managers, Affiliates, and all persons acting in concert with any of the foregoing.

"Person" or "person" means any individual, sole proprietorship, partnership, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization, association, corporation, foundation, charity, institution or any other entity.

"Family member" means, as applied to any person who is an individual, such individual's spouse, parent, stepparent, sibling, child, stepchild, grandparent, grandchild or other descendent thereof (whether natural or adopted).

"Disparage" or "disparaging statements" means, as to any of the Frydman Parties, regardless of truth, any statement or representation which in any way derogate or cast the Frydman Parties or the Frydman Entities in a bad light, or question or negatively remark on the integrity, character, knowledge, credibility, trustworthiness, veracity, ethics, performance, performance results, dependability, honor, credibility, responsibility, desirability, capability, payment history, litigation or dealings of the Frydman Parties, or which tarnish, blur, or dilute, or are likely to tarnish, blur or dilute the Frydman Entities.

"Trade secret" shall have the meaning given in the Delaware enactment of the Uniform Trade Secrets Act, and shall include, without limitation, the whole or any portion or phase of any scientific or technical information, design, process, formula, concept, data organization, manual, other system documentation, or any improvement of any thereof, in any case that is valuable and secret (in the sense that it is not generally known to competitors).

"Confidential Information" means trade secrets, proprietary information and information belonging to any Party, the Parties' respective entities and their Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements and other information obtained by a Party in connection with his/her involvement with one or more of the other Parties or such Parties' entities, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which such Party or such Parties' entities treat as confidential, in any format whatsoever, including oral, written, electronic or any other form or medium.

"execution of this Agreement" - is the date on which all parties hereto have signed this Settlement Agreement and delivered same to the other Parties, which is 1 of August.

14. **Notice.** All demands, notices, requests, consents and other communications required or permitted under this Agreement shall be in writing and shall be sent via: (a) personal delivery, (b) e-mail, with a confirmation copy sent by one of the other methods authorized in this Section, (c) reputable commercial express delivery service (including Federal Express and U.S. Postal Service overnight delivery service), or (d) deposited with the U.S. Postal Service mailed first class, registered or certified mail, postage prepaid, as set forth below:

If to the Veen Parties, or any of them:

Alex Veen
+ 19179099855

14/15 Soborna sq., office 6
Lviv – 79008 Ukraine

E-mail: alexveen@live.com

With a copy to:
Natalia Anokhina, Esq., attorney-at-law (License number 000073 issued by the Bar Council in Lviv region, Ukraine):
79000, Heroiv Majdanu Str., 32, 210
Lviv, Ukraine;
Email: Natalia.anokhina@arzinger.ua

If to the Frydman Parties, or any of them:

Jacob Frydman
48 Ledgerock Lane
Hyde Park, NY 12538
Email: J.Frydman@UnitedRealty.com

With a copy to:

Lewis Fischbein, Esq.
60 Broad Street, 34th Floor
New York, NY 10004
Email: l.fischbein@unitedrealty.com

Notices shall be deemed given and delivered upon the earlier to occur of (i) receipt by the party to whom such notice is directed; (ii) if sent by e-mail, on the day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) such notice is sent if sent (as evidenced by the facsimile confirmed receipt) prior to 5:00 p.m. Eastern Time and, if sent after 5:00 p.m. Eastern Time, on the next day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) after which such notice is sent; (iii) on the first day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following the day the same is deposited with a commercial courier if sent by commercial overnight delivery service; or (iv) the fifth day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following deposit thereof with the U.S. Postal Service as aforesaid. Each party, by notice duly given in accordance herewith, may specify a different address for the giving of any notice hereunder.

## 15. Additional Terms.

a. This Agreement shall be governed, construed, and enforced according to the laws of the State of New York, without regard to its conflict of laws principles.

b. Each Party expressly and irrevocably consents to jurisdiction in the state and federal courts located in the State of New York for any action, suit, or proceeding based on, arising out of or in any matter related to this Agreement. The United States District Court for the Southern District of New York and the Supreme Court of the State of New York, New York County, shall have exclusive jurisdiction of any dispute arising from or related to this Settlement Agreement. Each Party waives any defense of improper venue or inconvenient forum to the maintenance of any action or proceeding brought arising from or related to this Agreement.

c. **JURY WAIVER. THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY SUCH PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF, RELATING TO, OR IN ANY WAY CONNECTED WITH THIS SETTLEMENT AGREEMENT.**

d. The headings contained in this Agreement have been inserted for convenience only and in no way define or limit the scope or interpretation of this Agreement.

e. If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions shall remain in full force and effect.

f. This Agreement shall be binding upon, and inure to the benefit of, the Parties, as well as their parents, affiliates, successors, assigns, and present and former owners, members, managers, directors, officers, partners, agents, shareholders, employees, heirs, beneficiaries, and personal representatives, if any.

g. Each of the Frydman Releasees, the Frydman Entities and each of the Veen Releasees are intended to be third party beneficiaries hereunder.

h. This Agreement may be changed, waived, modified or terminated only by written and executed instrument signed by all Parties.

i. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes any prior agreements and understandings with respect to such subject matter. All prior and contemporaneous discussions and negotiations have been, and are, merged and integrated into and superseded by this Agreement, and the Parties have not been induced by any representations, statements, warranties, or other agreements other than those expressed herein in the making, execution, and delivery of this Agreement.

j. Each Party acknowledges that it has been represented by counsel and has received independent legal advice regarding the negotiation and execution of this Settlement Agreement. All of the terms, conditions and provisions of this Settlement Agreement

and any documents delivered pursuant to or in connection therewith shall be construed in a fair and even manner, not more strictly against any one party, and none of the parties is to be considered the draftsman of this Settlement Agreement for purposes of construction.

k. This Agreement shall not be invalid as a consequence of any administrative, typographic, or ministerial error.

l. This Agreement may be executed (including by electronic mail or facsimile) in separate counterparts, each of which when so executed shall be deemed an original and all of which taken together shall constitute one and the same agreement.

## 16. <u>Governing Law; Disputes.</u>

(a) This Agreement, all matters concerning the construction, interpretation or validity of this Agreement, all claims or causes of action (whether in contact or tort) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement and all matters otherwise concerning this Agreement or the transactions contemplated by this Agreement shall be governed by, and construed and enforced in accordance with, the Laws of the State of New York, without giving effect to any choice or conflict of Law provision or rule, whether in the State of New York or any other jurisdiction, that would cause the Laws of any jurisdiction other than the State of New York to apply.

(b) Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach of any provision thereof shall be resolved by litigation initiated and brought by the complaining party in the Supreme Court of the State of New York located in New York County, or the courts of the United States of America for the Southern District of New York, and appellate courts thereof, and in no other forum. With respect to any such litigation, each party irrevocably consents to service of process in the manner provided for the giving of notices pursuant to Section 10.1 of this Agreement. Nothing in this section 14 shall affect the right of any party to serve process in any other manner permitted by applicable Law.

(c) The Parties agree that jurisdiction over disputes relating to this Settlement Agreement shall be retained by the Court and Judge before which the Lawsuit is currently pending, enabling any party to this Agreement to seek further orders and directions as may be necessary or appropriate for the construction of or the carrying out of this Agreement, to determine any breaches, and for enforcement of this Agreement.

## 17. <u>Informed Execution.</u> Each Party hereby represents and warrants to each of the other Parties that he or it has read and understands all of the terms and conditions of this Agreement; intends to be bound by the terms and conditions of this Agreement, and that this Agreement constitutes a valid, binding and enforceable agreement against each of the Parties hereto in accordance with the terms hereof; and that such Party is executing this Agreement freely and

voluntarily, without duress, after consultation with independent counsel of their own selection.

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the day and year set forth below.

**PHILIP ALEX VEEN**

Date: 08/14/2015

Philip Alex Veen,
passport details: 48728170b

**SOFIA SVISHCH**

Date: 08/14/2015

Sofia Svishch,
passport details: KC 723505

**JACOB FRYDMAN**

Date: 08/14/2015

Jacob Frydman

**UNITED REALTY ADVISORS, L.P.**

Date: 08/14/2015

By:
Jacob Frydman

**PRIME UNITED HOLDINGS, LLC**

Date: 08/14/2015

By:
Jacob Frydman

## LAWFIRM ACKNOWLEDGEMENT:

The undersigned Attorney-at-Law representing the Veen Parties acknowledges that he/she is acting solely as an accommodation to the Parties to receive the Deliverables, send the LawFirm Notice, and after confirmation by Alex of receipt of funds per section 5(a) to electronically forward the Deliverables to the Frydman Parties, and for no other purpose. Nothing contained herein shall be deemed to subject the Attorney-at-law to any liability whatsoever, and each Party hereby waives all

FRYDMAN 00011890

claims against the Attorney-at-law. Attorney-at-law doesn't undertake to verify if the scope of information received from Alex or its content comply with requirements stipulated in paragraph 4 hereto, as well doesn't undertake obligations to verify its legitimacy or authenticity. Alex is providing Attorney-at-law only with copies of the documents and information, therefore the Attorney-at-law will not be liable to any damage, accidental removal or destruction of the Deliverables. Alex shall keep the originals of Deliverables or other copies of it at least till the Frydman's confirmation that the Deliverables are received. Attorney-at-law acts solely as an independent attorney and representative of the Veen Parties and is not as a representative and doesn't act on behalf of any other entity including any Law Firm, legal entity, Bar Association or his/her employer.

By: _____            14 th of August 2015
      Natalia Anokhina, Esq.

FRYDMAN 00011891

**EXHIBIT A**

FRYDMAN 00011892

IN THE UNITED REALTY STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
UNITED REALTY ADVISORS, LP and JACOB
FRYDMAN,

                         Plaintiffs,

                  -against-

ELI VERSCHLEISER, RAUL DELFORNO, OPHIR
PARNASI, and ALEX ONICA,

                         Defendants.
-------------------------------------------------------------------- X
JACOB FRYDMAN, UNITED REALTY ADVISORS,
LP, and PRIME UNITED HOLDINGS, LLC,

                         Plaintiffs,

                  -against-

ELI VERSCHLEISER, ALBERT AKERMAN, DAVID O.
WRIGHT, MULTI CAPITAL GROUP OF COMPANIES,
LLC, RAUL DELFORNO, OPHIR PINHASI, ALEX
ONICA, ALEX VEEN, SOFIA SVISHCH, ALEXANDER
MERCHANSKY and DOES 1 through 15 inclusive,

                         Defendants.
-------------------------------------------------------------------- X

14 Civ. 5093 (JGK) (MHD)
consolidated with 14 Civ.
8084 (JGK) (MHD)

## NOTICE OF VOLUNTARY DISMISSAL OF ALL CLAIMS
## AGAINST CAESARS ENTERTAINMENT CORPORATION WITH PREJUDICE

Pursuant to Fed. R. Civ. Proc. 41(a)(1)(A)(i), Plaintiffs Jacob Frydman, United Realty

Advisors, LP and Prime United Holding, LLC hereby voluntarily dismiss without prejudice all

claims against Defendants ALEX VEEN and SOFIA SVISHCH, neither of whom have served

an answer or otherwise responded to Plaintiffs' Complaint. Nothing contained herein shall in

any way impact or affect any of Plaintiff's claims asserted against any other Defendants, all of

such claims being expressly preserved.

FRYDMAN 00011893

Dated: New York, New York
       August __, 2015

By: _____
Jacob Frydman, *pro se plaintiff*
60 Broad Street, 34th Floor
New York, New York 10004
(212) 388-6800
Jacob.F@urpa.com

By: _____
Lewis Fischbein, Esq.
Attorney for United Realty Advisors, LP
60 Broad Street, 34th Floor
New York, New York 10004
(212) 388-6833
l.fischbein@unitedrealty.com

By: _____
Lewis Fischbein, Esq.
Attorney for Prime United Holding, LLC
60 Broad Street, 34th Floor
New York, New York 10004
(212) 388-6833
l.fischbein@unitedrealty.com

# EXHIBIT E

<span style="background-color:red">METRO</span>

# Real-estate honcho 'stiffs' contractors over measly amounts

By Julia Marsh and Josh Saul

November 17, 2014 | 4:11am



Developer Jacob Frydman allegedly hasn't paid contractors who worked on his Hyde Park estate (pictured) —then sued them while they sued him.

Shannon DeCelle

A New York real-estate honcho has not only stiffed multiple mom-and-pop contractors who worked on his palatial, multimillion-dollar home, but has countersued them over the relatively paltry amounts they've billed him, according to legal papers.

Ledgerock, a glass-and-stone house perched on the banks of the Hudson River in Hyde Park, is owned by Jacob Frydman, CEO of the $2 billion United Realty Trust.

Penny-pinching is "Jacob Frydman's method of doing business," said David Wright, the lawyer for the company APF Fire Protection, citing a

measly $6,700 bill. "Especially with regard to this project, he failed to pay several contractors, threatened lawsuits, or both."

Wright accused Frydman of trying to bully him into dropping a suit by threatening to "litigate me into the ground like I was something he scraped of the bottom of his shoe."

The Dutchess County mansion boasts six bedrooms, 12 bathrooms, stonework from Italy and tiles from Africa, according to one of Frydman's adversaries.

It also has sparked an impressive number of legal actions — nine.

In one of them, Frydman, 57, says APF did a shoddy job. It sent Frydman a $6,700 bill, which he refused to pay — and then he countersued for $125,000.

The dispute went to arbitration and Frydman was ordered to pay APF $39,000 to compensate it for legal fees it incurred. Frydman is appealing.

Another contractor, Vineyard Avenue Electric, went after Frydman for a $45,000 balance on an almost $700,000 job. An arbitrator awarded Vineyard $31,000 — and a judge threw out Frydman's $1 million countersuit.

The mogul, however, was able to erase a $120,000 debt to a garage company, American Architectural. Two years later, the firm went bankrupt.

Developer Frydman, whose projects include Two Dag Hammarskjold Plaza in Midtown, is still entangled in a case with his concrete contractor over a $100,000 invoice.

Frydman said the number of liens and legal actions are "par for the course … on a project that takes several years to build."

He also noted that the three liens filed against the Hyde Park property "were all dismissed by the court or vacated without payment being made."

He added he's confident the last pending suit against him will be dismissed.

Frydman was granted several environmental waivers by the local planning board to build the house on wetlands.

**FILED UNDER** [COMMERCIAL REAL ESTATE](#), [LAWSUITS](#), [REAL ESTATE](#), [11/17/14](#)